**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | |
| Plaintiff, | ) | |
| | ) | No. CR 16-121-TUC-CKJ |
| vs. | ) | |
| | ) | **ORDER** |
| Jose Antonio Ruiz, | ) | |
| Defendant. | ) | |
| ——————————————— | ) | |

Pending before the Court are the discovery issues regarding I-19 checkpoint statistics, canine statistics (and/or raw data) and canine training records.

Evidence and argument were presented to the Court on October 25, 2016, in a joint evidentiary hearing with CR 15-938-TUC-CKJ. As the briefs in the cases differ, the Court accepts any arguments made on behalf of one defendant as applying to both defendants.

I. *Factual and Procedural History*

On December 14, 2015, Jose Antonio Ruiz ("Ruiz") arrived at the Border Patrol checkpoint on I-19 near Tubac, Arizona, as the driver, and sole occupant of a Toyota Tundra. Niky, a Border Patrol canine patrolling the pre-primary area, alerted to the vehicle and the Ruiz was immediately directed to park in the secondary inspection area. An x-ray of the Tundra revealed square-shaped anomalies lining the interior of both of the truck bed's sidewalls above the wheel wells. Niky again sniffed the air around the pickup truck, and he again alerted to an odor he was trained to detect. Soon thereafter, agents discovered twenty-two packages in compartments above the rear wheel wells. Agents pierced one

representative package, exposing a white, powdery substance that field tested positive for cocaine.  The total gross weight of the cocaine discovered in the Tundra was roughly twenty-four kilograms.

On January 13, 2016, Ruiz was indicted for Conspiracy to Possess with Intent to Distribute Cocaine and Possession with Intent to Distribute Cocaine.

On May 18, 2016, Ruiz filed a Motion to Suppress (Doc. 34).  A response (Doc. 37) and a reply (Doc. 38) have been filed.

On July 17, 2016, Ruiz filed a Motion to Compel Disclosure (Doc. 39).  A response (Doc. 44) and an reply (Doc. 45) have been filed.  A protective order was issued as to confidentiality of law enforcement sensitive information, specifically, records related to U.S. Border Patrol canine Niky.  (*See* Docs. 46 and 47).  The magistrate judge denied the Motion to Compel Disclosure (Doc. 39) on August 23, 2016 (Doc. 49).  The magistrate judge stated the Motion to Suppress would be set for hearing at a later date and Ruiz anticipated filing a supplemental motion regarding the records that have been received regarding the canine.

On September 6, 2016, Ruiz filed an Appeal of Magistrate's Order Denying Motion to Compel Disclosure (Doc. 58).

On September 8, 2016, Ruiz filed an Amended Motion to Compel Disclosure (Doc. 62).  A response (Doc. 73) has been filed.

On September 18, 2016, the government filed a Motion to Stay Hearing on Defense Appeal of Magistrate Order (Doc. 66).  A response (Doc. 73) has been filed.

On September 19, 2016, Ruiz filed a Notice of Supplemental Authority (Doc. 67).

On September 19, 2016, this Court, *inter alia*, set argument on the Appeal and the Amended Motion to Compel for October 25, 2016, denied the Motion to Stay Hearing (Doc. 66) as moot, afforded the parties an opportunity to file supplemental briefs, and terminated the referral to the magistrate judge of the discovery issues related to the checkpoint and canine issues (Doc. 68).

The Court has received and reviewed the unredacted and redacted canine records submitted for an *in camera* review in CR 15-938-TUC-CKJ.  These records include the

declarations of Matthew B. Devaney ("Devaney"), Paul E. DuBois ("Dubois"), and Damien E. Montes ("Montes").  A supplemental Declaration (CR 15-938, Doc. 115-2) by Devaney has been submitted and reviewed by this Court.

During an October 5, 2016, status conference, this Court stated it would conduct a *de novo* review of the disclosure issues and hear all motions in this case (Doc. 75).

A joint evidentiary hearing with CR 15-938-TUC-CKJ on disclosure issues was held on October 25, 2016.  At the conclusion of the hearing, the Court took the disclosure issues under advisement (Doc. 83).

II. *October 25, 2016, Hearing*

The government advised the Court it does not object to disclosure of Exhibits 1-5, 15, 29, 31, and 32 of the canine records submitted for *in camera* review, as stated in the affidavit of Matthew Delaney (CR 15-938-TUC-CKJ, Doc. 115-2).   Defense counsel advised the Court that the canine records submitted in CR 15-938-TUC-CKJ is intended to apply in this matter as well.  Exhibits 1-5 were admitted during the hearing.  The Court will direct exhibits 1-4 be docketed with this Order.

A. *Summary of Testimony of U.S.B.P. Division Chief Raleigh L. Leonard*

Raleigh L. Leonard, Division Chief, Law Enforcement Programs, U.S. Border Patrol, Tucson Sector ("Leonard"), testified the Nogales station area of responsibility includes approximately 30.3 linear miles of international border between the United States and Mexico and encompasses four border zones and two northern zones.  *See* Ex. 5.

In the Tucson Sector, there are eleven checkpoints, located on every major route of egress away from the border.  Checkpoints are typically located in areas that have high levels of activity along the border (border crossings, illicit activity), are safe for the motoring public (in coordination with the Arizona Department of Transportation), not located directly adjacent to densely populated areas, not in close proximity to the border, and do not constitute a major egress leading away from the border.  Additionally, pursuant to federal

1    regulations, checkpoints may be as far as 100 air miles from an international border.

2            The use of checkpoints is a safer alternative than roving patrols.

3            The primary focus of the checkpoints is the enforcement of immigration laws and to

4    have everybody who passes through the checkpoints state their citizenship.  Many thousands

5    of immigration status determinations occur in the Tucson Sector, which result in a very small

6    number of immigration violations; an even smaller number of narcotics violations; and even

7    fewer other violations.

8            The busiest checkpoint in the Tucson Sector is the I-19 checkpoint located

9    approximately 25 miles north of Nogales.  According to statistical analysis completed by the

10   Arizona Department of Transportation, over 18,000 vehicles went through the checkpoint

11   in 2015 and over 17,000 vehicles went through the checkpoint in 2014.  The checkpoint is

12   strategically located in the center of a valley; although it can be walked around, it is a

13   challenge to drive around.[1]  An integrated fixed tower located adjacent to the I-19 checkpoint

14   detects a tremendous amount of traffic of people attempting to circumvent the checkpoints.

15   The area also includes sensors and agents on patrol in ATVs, horse patrol, or on foot.

16           Signs around the checkpoints alert people approaching the checkpoint to slow down

17   and that it is a Border Patrol checkpoint.  It is a clearly marked location where vehicles are

18   asked to stop and then continue north away from the U.S.-Mexico border.  A large canopy

19   at the checkpoint covers most of the three lanes at the checkpoint (other than for major

20   holiday weekends or because of the flow of traffic, typically only two lanes are in operation).

21   A housing unit allows agents to monitor traffic and support the agent who is in primary.  By

22   primary, Leonard refers to a Border Patrol agent standing in the open, between the lanes with

23   a stop sign next to him.  As vehicles pull up to him, the agent conducts his immigration status

24   determination of the vehicle.  The I-19 checkpoint is open 24 hours a day, seven days a week,

25   365 days a year.  Although some checkpoints may shut down because of inclement weather,

26   _____

27           [1]The I-19 checkpoints was located further south prior to 2006.  Based on population
     growth and security risks (e.g., nearby school), a strategic location further north is now being
28   used.

- 4 -

1    the I-19 checkpoint never shuts down.

2          There are 5,000 points where someone who was interested in entering the United

3    States unlawfully can use some sort of terrain feature to effect an unlawful entry into the

4    United States.[2]  The Nogales station area of responsibility ("AOR") is heavily trafficked by

5    undocumented migrants who are attempting to circumvent Border Patrol resources.

6          Approximately 24 canines are currently assigned to the Nogales Border Patrol station.

7    The canines are divided up amongst the various shifts to make try to ensure there is always

8    a detection canine on duty at the I-19 checkpoint.  However, the canines are not always on

9    duty due to getting over-heated, being injured or being sick.  The availability of canines may

10   also be affected by their be used for tracking or trailing if a tactical request is made from the

11   field.

12         As vehicles pull into a checkpoint, a canine handler and a leashed canine are located

13   just ahead of the agent standing in primary.  At the I-19 checkpoint, this means the canine

14   is directly south of the agent at the stop sign.  The canine handler and the canine walk around

15   the traffic that is approaching the primary immigration checkpoint.  Leonard refers to this

16   area as pre-primary.  The canine handler does not interact with the occupants of vehicles, but

17   is looking at and interacting with his canine.  If a canine alerts, the canine handler notifies

18   the agent at primary.  The agent at primary will refer the vehicle to secondary.

19         The agents at primary always ask questions related to immigration status.  A check

20   is done of every occupant of every vehicle.[3]  These questions are asked regardless of whether

21   a canine has alerted to a vehicle.

22         Leonard testified as to the statistics summarized in the government's exhibits.  The

23   _____

24         [2]It appears the testimony was referring to unlawful entry points within focus area 1, which
     includes the Nogales station.

25

26         [3]Referring to a delivery man who goes through the checkpoint every day, a doctor who
     lives nearby, and the mayor of Tubac, Leonard clarifies that agents may tell a local resident
27   traversing through the I-19 checkpoint to just go through the checkpoint. He also clarifies that,
     when a canine has alerted to a vehicle, in some situations the agent at primary may just direct
28   the vehicle to secondary without questioning the driver as to immigration status.

statistics were prepared by the Washington, D.C., headquarters office of Border Patrol.  The headquarter analysis relied upon classification of the reports/events by individual agents. Prior to being notified by headquarters that it would compile the data, local agents had begun a report by report analysis; Leonard does not recall if the local analysis was ever completed. As far as Leonard knows, the data system used by headquarters cannot clarify which or how many canine alerts related to humans or narcotics, but that data is contained in the narrative portions of agents' reports.   The statistics from headquarters include activity that occurred at the Arivaca and I-19 checkpoints.

Referencing the exhibits, Leonard testified regarding the number and the types of arrests at the I-19 checkpoints.  There were a total of 242 arrests (from 128 events, which generally is a vehicle from which an arrest is made, but can include a bicycle or a single person on a shuttle) from October 21, 2014, through April 20, 2015 at the I-19 checkpoint. This includes all arrests whether they pertained to immigration or not.  Of those totals, there were 72 immigration related events that resulted in the arrest of 181 persons.[4]  These persons need not be illegal immigrants, but are related to an immigration offense.  Leonard initially testified that illegal immigrants who are arrested for narcotics offenses are not included in the immigration related totals, but later stated they are defined under both headings.  During the same time period, there were 65 narcotic related arrests (out of 55 narcotic related events).  18 of those arrestees were not United States citizens.[5]  During that same time period there were 61 non-immigration related arrests.  This includes narcotics related arrests.  This number is lower than the narcotics related number because some of the 65 narcotics related

---

[4]Leonard clarified the criteria for this category of the statistics means there would be an administrative or criminal alien smuggling case.  Specifically:
     *Immigration Related include events with at least one of the following criteria:
          - Incident type of AAS or CAS
          - Includes a deportable alien
          - Includes a subject presented for prosecution on an 8 USC 1324 charge
Exs. 3 and 4.

[5]The testimony did not clarify if this included both illegal aliens and Lawfully Authorized Permanent Residents ("LAPR").

1   arrests involved some persons not in violation of immigration laws.  The persons referred to

2   are 14 years of age or older.[6]

3        Statistics from the nearby area zones show the activity that occurs at the checkpoint

4   is similar, but with less immigration related events compared to narcotics related events in

5   those other areas.

6

7   B. *Summary of Testimony of U.S.B.P. Supervisory Agent Alex Markle*

8        Border Patrol Supervisory Agent Alex Markle ("Markle") testified that his duties

9   include  selecting  and testing canines for purchase by Customs and Border Protection

10  ("CBP"), training new canine handlers, training canines, developing curriculum for the use

11  and training of new canine handlers, training  instructors within the canine program of CBP

12  and other related duties.  Markle adopted the affidavits submitted by Devaney.

13       The curriculum includes the training of the handlers during classroom setting (e.g.,

14  legal instruction, mock scenarios), the field instruction and rating of canine handlers during

15  the field instruction, and certification testing of the canine handlers and canines.

16       The selection of canines comes with a 180 day health guarantee as well as a 15 day

17  return policy should  the canine have any problems or if unforeseen issues arise.  The canines

18  are put through a series of exercises designed to show what the canine is capable of and

19  desires to do.  The canines are evaluated on temperament, reaction, and physical capability.

20  Because CBP encompasses  every possible geographic area and environments in the United

21  States, canines have to be suitable for all possible environments for use in deployment.

22       As related to immigration offenses, canines are used for the primary purpose of

23  detecting concealed humans.  Border Patrol utilizes physical apprehension canines, search

24

25  ————————————

26       [6]Leonard testified as to the statistics in Ex. 3.  Ex. 4 indicates there were 582 total arrests
    (arising from 318 total events) at the I-19 checkpoint from June 15, 2015 – June 14, 2016.  Of
27  those totals, there were 184 immigration related events that resulted in 457 immigration related
    arrests.  During the same time period, there were 121 narcotic related arrests (out of 113 narcotic
28  related events).  25 of those arrestees were not United States citizens.

and rescue canines, and concealed human and narcotic detection canines.  Detection canines are trained to detect the odors of marijuana, heroin, cocaine, methamphetamine, ecstasy and concealed humans.

Typically during every two-week period throughout the entire year a handler and canine receives eight hours of documented training.   The ongoing training is designed to be a challenge for the canine team and is meant to improve their performance overall.

The quarterly training records, because of the scores having been averaged, make it obvious if additional training is needed.  A certification is an evaluation because it is the overall evaluation of a canine team and it certifies that a canine team has passed the certification training.  A canine team is certified for one year.

As a team, a canine handler and the canine pass or fail.  If they fail certification they receive 40 hours of remedial training and then are tested via certification again; if they  fail that certification testing, the team is then separated upon approval by the director of the CBP canine program.  Of the two, the canine handler is the most likely to fail – 90 % of the time the problems can be resolved by removing the handler.

Markle testified as to some of the exercises utilized during the yearly certification, consisting of vehicles, warehouses, occupied buildings, open area searches, livestock environments, and luggage and parcel searches.

Regarding the redacted records submitted to the Court for an *in camera* review, Markle testified that specific portions of the training program are redacted because of concerns of reverse engineering, testing of contraband and human concealment methods, or other attempts to defeat law enforcement efforts by people who are smuggling people or contraband into the United States.  The concern is not only what is contained in the documents, but what knowledge comes with it – in other words, once that knowledge is acquired, it cannot be forgotten.  Further, that knowledge can be transferred to other arenas (e.g., chemical munitions).

Markle states that, with the proposed redactions, the reliability of a canine can be evaluated by examining the entire program and processes, without going into the specifics.

1    Markle believes SWIG is an acronym for the scientific working group (researchers

2 and practitioners) of detection and original graphic detection dogs.  This panel has put

3 together some best practices for various aspects of detection – canines as well as other

4 disciplines regarding canines.  This panel recommend a single blind and odor range of

5 motion for purposes of certification testing.

6    Canines are trained to detect concealed humans in the same manner by which disaster

7 canines are trained.  The canines are also trained to ignore visible humans.

8    Border Patrol has a huge swath of land to cover, and canines are used throughout the

9 entire Southern Arizona Border Patrol area of operation.  Canines are used in the desert and

10 at the ports of entry in support of field operations.  Canines are used to locate, for example,

11 narcotics that are discarded in the desert when a person has absconded.  It is an efficient use

12 of resources to train the canine for both concealed human and narcotics detection.  All

13 canines that search for narcotics also search for concealed humans.  CBP canines are also

14 trained for other detections – e.g., currency and firearms.  Since Customs and Border Patrol

15 merged into CBO in 2010, all of their canines are trained the same.

16    Markle is aware of case law establishing the defense has a right to receive

17 documentation regard the K-9 and the canine handler's ability in order to effectively

18 cross-examination the handler.  The unredacted documents inform the defense of the training

19 for imprinting, searching, and indicating, but the details of how it is done is not provided.

20 The lack of the defense knowledge of the details does not hinder cross-examination because

21 a canine handler does not know of the process and it does not show the reliability of a canine

22 in the field.  Markle is not aware of the curriculum having ever been released in unredacted

23 form.

24    An alert is the canine's subconscious change of body posture and increased respiration

25 when the canine encounters the odors it has been trained to recognize.  A canine is trained,

26 after an alert, to give a passive indication (e.g., sit, point) pinpointing the strongest source of

27 that odor.

28    The CBP canines are not "dual-trained."  Dual-trained means a canine is, for example,

1    a detection canine and a physical apprehension canine.  The CBP has solely detection

2    canines.

3          Other persons/entities other than CBP train and use canines.  The CBP canine training

4    program is comprehensive and is continually reevaluated.  The CBP canine training program

5    has been evaluated by both a government agency and a non-government entity.

6

7    C.  *Summary of Testimony of Expert Lawrence Joseph Myers, Ph.D.*

8          Lawrence Joseph Myers, Ph.D. ("Dr. Myers"), has an educational background in

9    veterinary medicine, neurophysiology, and sensory function and behavior.[7]  He first started

10   studying canines and canine training in 1982 and has continued to do so until the present.

11         Over the years, Dr. Myers has become familiar with Border Patrol's training and

12   certification programs for detection canines.  He has reviewed and made recommendations

13   for canine training program curricula, including detection for explosives, for other

14   government agencies.  He has occasionally acted as a troubleshooter and consultant working

15   alongside canine handlers/instructors for other government agencies.  In 1992, he was asked

16   to and did give a short course on various aspects of detector dogs in El Paso, Texas.

17   However, that information is not included in his curriculum vitae.  Dr. Myers testified his

18   curriculum vitae was complete through 2008, but after 2008 it has not been completely

19   updated.

20         Other than the 1992 course, Dr. Myers testified he has never worked for or worked

21   in any capacity as an instructor in a canine training program and has never worked as a

22   canine handler.

23   _____

24         [7]Dr. Myers' curriculum vitae indicates he has worked at Auburn University as an
     Assistant Professor and an Associate Professor for the Department of Physiology and
25   Pharmacology and a Director for the Institute for Biological Detection Systems at different times
     since 1982.  He has received numerous honors and awards; has served on multiple panels and
26   board memberships, has made many presentations, and has participated in several peer reviews;
     the majority of these activities were related to canine detection.  Dr. Myers has also published
27   numerous book chapters, articles, and abstracts as well as having completed over 40 government
     reports and data compilations.  *See* Exs. 31 and 33.
28

1    Dr. Myers stated that because of the substantial redactions of the canine records, he

2  is unable to tell to what training modules or subsections the materials are referencing.  He

3  is unable to get enough information about the CBP detection canine training and certification

4  program to develop opinions about  whether it was appropriately developed or not.  He was

5  not able to develop an opinion because critical information that he would normally try to

6  examine is redacted.  It would be helpful to Dr. Myers if the documents were not redacted.

7  Should he be provided with the unredacted material, Dr. Myers does not foresee a way that

8  his receipt of the documentation could result in someone from a drug cartel reverse

9  engineering the Border Patrol canine training and certification program such that they could

10  learn how to avoid being detected.

11    Dr. Myers opined that the current redacted status of the documents does not allow him

12  to advise defense counsel in a way that would help him prepare to cross-examine government

13  witnesses on the subject.  He clarified that the evaluation methodology is also redacted.

14  Although he has a document with numbers in various categories, he has no way to form an

15  opinion of the meaning or validity of the numbers.  Dr. Myers stated that the labeling of each

16  section is not redacted, just specific redactions within each category; he can see the

17  categories for evaluation for both the canine handler and the canine.  A review of the table

18  of contents does not provide Dr. Myers a basis to determine if the CBP canine training and

19  certification program is appropriate.  The application of a methodology is different than the

20  theory of a methodology.

21    For canine training, there needs to be a minimum of single blind, but preferably with

22  double blind.  For canine certification, double blind is required.  However, only a couple of

23  agencies or groups require double blind certification; the SWIG working panel recommends

24  double blind as a best practice.[8]  As an analogy, evaluating an educational transcript, without

25  looking at the specific curriculum, does not provide an adequate evaluation.

26    Dr. Myers has been involved in canine cases in which he has received more

27  

28    [8]A SWIG dog is a scientific working dog.

unredacted records than those provided to him in this case. Although redaction is not normally allowed, the Federal Bureau of Investigation certification records are an exception.

III.  *Requested Disclosure as to Constitutionality of Checkpoint and Canines*

A.  *Ruiz's Request*

Ruiz requests the Court order disclosure of:

a) how many canine alerts were made at the I-19 checkpoint for the 12-month bracketing the incident date in this case. ie the period six months prior to and six months following December 14, 2015;

b) how many of these canine alerts resulted in the seizure of "concealed humans" and how many resulted in the seizure of drugs;

c) how many of these canine alerts revealed no contraband at all.

d) training materials for the canine named Niky, including all the logs [] from his training exercises and proficiency tests (both during training and also all his subsequent follow-up tests) and all coursework materials used during his training.

Motion to Compel Disclosure (Doc. 39), p. 2.

Ruiz asserts the information is germane to the issues raised in his Motion to Suppress. Further, Ruiz asserts that, not only is the information discoverable pursuant to Fed.R.Crim.P. 16., it is also information that should be available for the Court to determine whether the government has sustained its burden of proving that the purpose of the canine at the checkpoint is immigration-related and not for narcotics-interdiction.

Ruiz also asserts the United States Border Patrol is the only entity that has all of the data regarding searches and arrests at the checkpoint. Indeed, Ruiz asserts the actual numbers of what was occurring at a given checkpoint were more or less dispositive of the case in *United States v. Soto-Camacho*, 58 F. 3d 408 (9th Cir. 1995). Therefore, he asks: "[W]]hy was the government so readily able to provide the numbers in Soto-Camacho, at a time when computers and computer data were more cumbersome to deal with than they are today, but is hamstrung by unknown and undefined difficulties in 2016?" Motion to Compel Disclosure (CR 16-121-TUC-CKJ, Doc. 39), p. 3. Indeed, Ruiz asserts it should not be so difficult to review the reports (from the I-19 checkpoint taken in the normal course of

1   business for the time periods) to sort them into the requested categories.  Alternatively, Ruiz

2   would not object to the disclosure of the raw data.

3

4   B.  *Relevant Issues to Be Reviewed for the Motion to Suppress*

5           The issues raised in the Motion to Suppress are the constitutionality of the checkpoint,

6   the use of the canines at the checkpoint, and the reliability of the canines.[9]  The Supreme

7   Court has determined that the government's legitimate interests advanced by a temporary

8   seizure outweigh the minimal intrusion on a motorist's privacy.  *United States v.*

9   *Martinez-Fuerte*, 428 U.S. 543,  561-62 (1976).  In balancing these interests during a

10  checkpoint stop, the Court considered: (1) whether the checkpoint procedures were routinely

11  and evenly applied to all vehicles; (2) whether the checkpoint involved little agent discretion

12  and was not likely to result in abuse; and, (3) whether the appearance of authority of the

13  agents at the checkpoint would allay the concerns of lawful travelers.  Id. at 556-60.

14          In *Soto-Camacho*, the court stated:

15          Except for the potential influence of drug intelligence on the decision of when within
            the month to activate it, the Jacumba Checkpoint does not differ in any material
16          respect from the temporary checkpoint at Camp Pendleton that we condoned in
            Hernandez.  Its primary purpose is to check for aliens, all vehicles are stopped, the
17          checkpoint is well identified, Border Patrol agents exercise no discretion over the
            checkpoint's operation, and the stop itself involves a minimal intrusion.
18
19  58 F.3d at 411 (footnote omitted).  In *Soto-Camacho*, the checkpoint was operational for

20  about ten days out of each month, with "historical data reflecting trends of alien entries, alien

21  smuggling, narcotics smuggling, and an evaluation of the peak periods of these trends" and

22  "harvest seasons[,]" *id*. at 410, included as  factors used to determine when the checkpoint

23  would be operational.  The historical data referred to included that "a large percentage of

24  checkpoint narcotic seizures involve alien principals (during the period from January 21,

25  1992 through April 24, 1994, 76% of the narcotic seizures at the Jacumba Checkpoint

26  involved alien principals)" and that:

27  _____

28          [9]The reliability of the canines will be discussed in section IV.

> Between January 21, 1992 and April 24, 1994, Border Patrol agents at the Jacumba Checkpoint made at least 322 separate illegal alien seizures and apprehended 1,544 illegal aliens. During the same period, there were 68 seizures of controlled substances discovered in vehicles and 87 persons were arrested as a result.

*Id*. at 410-11. The government also points out that, after discussing *United States v. Watson*, 678 F.2d 765, 769 (9th Cir.), cert. denied, 459 U.S. 1038, 103 (1982), *Soto-Camacho* found the stop and search of Soto-Camaco had an "independent administrative justification," and "did not exceed in scope what was permissible under that administrative justification." *Soto-Camacho*, 53 F.3d at 412, (citing *Watson*, 678 F.2d at 771). Thus, the immigration checkpoint was "not infected" by the fact that Border Patrol based the timing of the operation of the checkpoint in part on drug intelligence. *Id*.

C. *Relevant Statistics Provided by the Government*

In this case, the evidence establishes the I-19 checkpoint is operational 24 hours a day, 365 days a year. Efforts are made to ensure a canine is always there, but one is sometimes not available. In other words, an initial review indicates the historical data reflecting trends is not considered in determining when the checkpoint is operational. Nonetheless, that does not mean the statistics and/or the canine information requested by Ruiz may not be relevant in determining the issues raised by Ruiz.

The testimony and exhibits presented at the hearing establish information comparable to that considered in *Soto-Camacho* has now been disclosed by the government. During a one year period around the arrest of Ruiz there were a total of 582 (305 + 277) arrests. Of these arrests, 457 (240 + 217) of the arrests were immigration related and 121 (58 + 63) of them were narcotics related. 35 (18 + 17) of the narcotics related arrests involved non-United States citizens; these narcotics arrests are also included in the immigration arrests if they involved a deportable alien. This means there were approximately 86 (121-35) United States citizen narcotics related arrests.[10] Additionally, there were a total of 125 (65 + 60)

_____

[10]"Approximately" was used because the testimony did not establish that non-United States citizens were necessarily deportable aliens.

non-immigration arrests (this includes narcotics events and other crime events).  During the same period, there were a total of 318 (163 + 155) events – 184 (97 + 87) of them were immigration related and 113 (49 + 64) of them were narcotics related, with 25 (13 + 12) of the narcotics related events involving non-United States citizens.  *See* Ex. 4.

This means, at the I-19 checkpoint from June 15, 2015 through June 14, 2016, 78.5% of the arrests were immigration related, 72.5 % of the arrests were only immigration related arrests (not including any overlap with narcotics related arrests)[11], and 21.5% of the arrests were non-immigration related.  The narcotics related arrests involving United States citizens (i.e., not immigration related at all), constituted 14.8% of the total arrests.  Additionally, 57.9 % of the events were immigration related and 35.5 % of the events were narcotics related (this includes some overlap with deportable aliens).

Statistics from the nearby area zones show the activity that occurs at the I-19 checkpoint is similar, but with less immigration related events compared to narcotics related events in those other areas.  *See* Ex. 4.  For example, during the same time period, 91.6% of the arrests in Zones 38 and 47 were immigration related and 97.6% of the arrests in Zone 19 were immigration related.  *See* Exs. 1-2, 4.

D. *Materiality*

"To obtain discovery under [Fed.R.Crim.P. 16], a defendant must make a prima facie showing of materiality."  *United States v. Mandel*, 914 F.2d 1215, 1219 (9th Cir. 1990) (citing *United States v. Little*, 753 F.2d 1420, 1445 (9th Cir. 1984).  Evidence is material under Rule 16 if it is "relevant to the development of a possible defense," *Mandel*, 914 F.2d at 1219 (citation and internal quotations omitted), or if it will "enable the accused to substantially alter the quantum of proof in his favor," *United States v. Marshall*, 532 F.2d 1279, 1285 (9th Cir. 1976); *see also United States v. Hernandez-Meza,* 720 F.3d 760, 768

---

[11]To calculate this percentage, the Court reduced the number of immigration related arrests (457) by the number of narcotics related non-USC arrests (35).  The remaining 422 arrests constitutes 72.5% of the total arrests.

(9th Cir. 2013) (the low threshold of materiality is satisfied if the information would have helped to prepare a defense); *United States v. Santiago*, 46 F.3d 885 (9th Cir. 1995) ("threshhold showing of materiality requires a presentation of 'facts which would tend to show that the Government is in possession of information helpful to the defense") (citing *Mandel*, 914 F.2d at 1219).

Courts have distinguished between evidence that is exculpatory, and thus discoverable under *Brady v. Maryland*, 373 U.S. 83 (1963), and evidence that is material and, therefore, discoverable under Fed.R.Crim.P. 16. *See e.g., United States v. Messerlian*, 832 F.2d 778, 795 (3rd Cir. 1987) ("under Rule 16(a)(1)(D), the information that the government must disclose need not be exculpatory; it merely must be material to the preparation of the defense"); *United States v. Beasley*, 576 F.2d 626, 630 (5th Cir. 1978) ("*Brady* is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation"); *United States v. Kaplan*, 554 F.2d 577, 579-80 (3rd Cir. 1977) ("where documentary evidence is exculpatory, it may be within both Brady and Rule 16, but nonexculpatory records are obtainable in advance of trial only by virtue of Rule 16").

Additionally, evidence that would impeach a central prosecution witness is indisputably favorable to the accused. *United States v. Price*, 566 F.3d 900 (9th Cir. 2009); *see also Davis v. Alaska*, 415 U.S. 308, 316 (1974) (in general, the Sixth Amendment right of confrontation permits a defendant to cross-examine witnesses in order to test the believability of the witness). Lastly, some district courts have determined that the question is whether "evidence is favorable to the defense or likely to lead to the discovery of favorable evidence." *United States v. Moore*, 867 F. Supp. 2d 150, 151 (D.D.C. 2012) (emphasis added); *United States v. Sudikoff*, 36 F.Supp.2d 1196, 1198–99 (C.D.Cal. 1999). Additionally, a court is to consider whether a request would be unduly burdensome in light of the materiality shown. *Mandel*, 914 F.2d at 1219.

As to the statistics regarding the arrests and events that occurred at the 1-19 checkpoint, the government has now provided those statistics to Ruiz and the Court. These

statistics are comparable to those used in *Soto-Camacho*.[12]  Ruiz, however, seeks additional

statistics and the raw data.

The government cites to a number of cases which show that a checkpoint's

"effectiveness may be measured by the relationship of the checkpoint to its objective, rather

than by any measurable results, or by any results period[.]"  *United States v. Fraire*, 575 F.3d

929, 934 (9th Cir. 2009)  (internal quotation marks and citation omitted):

> *United States v. Faulkner*, 450 F.3d 466, 473 (9th Cir. 2006) (discussing Supreme
> Court's approval of immigration checkpoints in Martinez-Fuerte notwithstanding that
> only 0.12% of vehicles stopped were found to be transporting illegal aliens, and
> similar approval of sobriety checkpoints in *Michigan Department of State Police v.
> Sitz*, 496 U.S. 444 (1990), notwithstanding that only 1.6% of drivers there were
> arrested for alcohol impairment); *see also United States v. Scott*, 450 F.3d 863, 869
> (9th Cir. 2006) ("primary purpose" determined based solely on "programmatic
> purposes" of the checkpoint, not any subjective operational intent).

Response to Motion to Compel Disclosure (CR 16-121-TUC-CKJ, Doc. 44), p. 4.

However, Ruiz points out that *Fraire* and *Faulkner* qualified the discussion to "certain

cases[,]" and distinguishes the cases as involving "park rangers talking to drivers as they

entered a national park where they would have had to stop anyway, and where the stops

served specific and articulated purposes relating to the welfare of the parks[,]" which is not

comparable to a checkpoint on a large freeway.  Reply to Motion to Compel Disclosure (CR

16-121-TUC-CKJ, Doc. 45), p. 5.  Ruiz also points out *Soto-Camacho* considered results in

determining the programmatic intent of the checkpoint and the Supreme Court has

recognized inquiry into the purpose of a checkpoint may be appropriate:

> For this reason, we examine the available evidence to determine the primary purpose
> of the checkpoint program.  While we recognize the challenges inherent in a purpose
> inquiry, courts routinely engage in this enterprise in many areas of constitutional
> jurisprudence as a means of sifting abusive governmental conduct from that which is
> lawful.  Cf. 183 F.3d at 665.  As a result, a program driven by an impermissible
> purpose may be proscribed while a program impelled by licit purposes is permitted,

---

[12]Indeed, the Ninth Circuit has recently stated a defendant "should not have to rely solely
on the government's word that further discovery is unnecessary." *United States v. Soto-Zuniga*,
837 F.3d 992 (9th Cir. 2016) (quoting *United States v. Budziak*, 697 F.3d 1105, 1113 (9th Cir.
2012).  However, that court was discussing disclosure of checkpoint statistics, not the raw data.
Additionally, the Court notes the mandate has not yet issued in *Soto-Zuniga*.

even though the challenged conduct may be outwardly similar. While reasonableness under the Fourth Amendment is predominantly an objective inquiry, our special needs and administrative search cases demonstrate that purpose is often relevant when suspicionless intrusions pursuant to a general scheme are at issue.

*City of Indianapolis v. Edmund*, 531 U.S. 32, 46-7 (2000).

The Court agrees with the defense that inquiry into the statistics may be appropriate to determine programmatic intent of the I-19 checkpoint. *Edmond*, 531 U.S. at 45 ("programmatic purposes may be relevant to the validity of Fourth Amendment intrusions undertaken pursuant to a general scheme without individualized suspicion"). However, this agreement is only as to the checkpoint statistics, which have now been provided to Ruiz. Ruiz's assertion that he needs the additional statistics regarding canine use or the raw data exceeds an inquiry into the constitutionality of the checkpoint. Rather, it seeks to determine the viability of a specific tool (the canines) utilized by agents at the checkpoint. Ruiz has not pointed to any authority that supports such an inquiry (except as to the reliability of the canines). Indeed, the inquiry at issue in *Edmund* was whether a checkpoint whose primary purpose was to detect evidence of ordinary criminal wrongdoing was constitutional. In fact, to the extent *Edmund* addressed the use of canines, it was to state, "[t]he fact that officers walk a narcotics-detection dog around the exterior of each car at the Indianapolis checkpoints does not transform the seizure into a search." *Edmond*, 531 U.S. at 40. The defense's reliance on *Edmund* does not refute the constitutionality of dual purpose checkpoints that have been approved by the Ninth Circuit. *Soto-Camacho*, 53 F.3d at 412 (the immigration checkpoint was "not infected" by the fact that Border Patrol based the timing of the stop in part on drug intelligence").

The defense also asserts, in essence, that he does not trust CBP to accurately enter data regarding the events and arrests. Therefore, the defense needs to review the raw data to confirm the statistics. However, the system as described by Leonard does not allow any discretion in the data input. The Court does not have any basis to conclude errors infected the data so as to make the statistics unreliable.

Where, as here, the statistics establish that a majority of the events and arrests at the

I-19 checkpoint were immigration related, it is difficult to conclude that Ruiz has presented facts which tend to show the government possesses additional information helpful to the defense.[13]  Indeed, the Ninth Circuit has stated that "where officers have broad discretion as to the parameters of the search, the addition of an impermissible motive extends the scope of the search, regardless of whether the items searched could have been subject to a valid administrative search."  *United States v. Bulacan*, 156 F.3d 963, 970 (9th Cir. 1998), as amended (Nov. 16, 1998); *see also Hernandez*, 739 F.2d at 488 (for *Martinez-Fuerte* to apply, checkpoint need not operate all the time or be at a permanent structure; important factor is lack of discretion when operated).  Therefore, where agents have only limited discretion, an additional motive of using canines for not only human detection but also narcotic detection is not a material factor in determining whether a checkpoint is constitutional.  The testimony in this case establishes that, except for a few known local residents, the agents consistently follow the same procedure.

Furthermore, the Court cannot conclude additional statistics or the raw data is material because the testimony did not establish the use of canines extended a stop at the I-19 checkpoint.  Rather, the testimony established the canines initially alert to a vehicle prior to (pre-primary – while in line) or during the brief questioning during the initial stop (primary inspection) – this does not extend the brief stop allowed by *Martinez-Fuerte*.  Indeed, the Ninth Circuit has stated:

> The lack of evidence supporting referral to secondary inspection is precisely what *Martinez-Fuerte* authorized.  It would set that decision on its head to say that, while agents do not need articulable suspicion to refer for immigration-related inquiry, they must offer articulable suspicion of immigration-related offenses to demonstrate that they are not referring for another purpose.

*United States v. Barnett*, 935 F.2d 178, 181 (9th Cir. 1991).  The court further stated:

> Had [defendants] offered affirmative evidence that the first agent harbored a subjective purpose to refer to secondary inspection for drug-related offenses, we would be required to address the applicability of the cases that deal with pretextual seizures to the type of stop authorized by *Martinez-Fuerte*.  [Citations omitted.]  But

---

[13]This is not to say the Court would necessarily conclude materiality had been shown if statistics did not show a majority of the events and arrests were immigration related.

in the absence of that evidence, we need not reflect upon the applicability of *Martinez-Fuerte* to referrals where it appears that the referral is only (or even partially) for drugs. [Defendants] have offered no evidence why this was not a legitimate immigration stop. The agent at initial inspection offered evidence consistent with an immigration purpose.[4] Thus, *Martinez-Fuerte* controls. No articulable suspicion was required.

> [4]*See United States v. Watson*, 678 F.2d 765, 771 (9th Cir. 1982), *cert. denied*, 459 U.S. 1038, 103 S.Ct. 451, 74 L.Ed.2d 605 (1982):
>
> > We assume that the administrative plan which led to the boarding of the [vessel] was motivated partly by suspicion of drug smuggling. However, the stop and search had an independent administrative justification, and did not exceed in scope what was permissible under that administrative justification. Therefore, we need not consider any criminal enforcement interest the Coast Guard may have had.

*Barnett*, 935 F.2d at 181-82. Indeed, the Supreme Court has stated that the walking of a drug-sniffing canine around a vehicle during a traffic stop is permissible, *Illinois v. Caballes*, 543 U.S. 405, 409 (2005).[14] Without any basis to conclude the use of canines extends checkpoint stops, the requested discovery is not material.

Lastly, the Court considers the CBP's use of the canines. The canines are not trained solely for human and narcotics detection. They are also trained to detect other items, including currency and firearms. In other words, contrary to the implicit argument of Ruiz, the use of the canines is not simply to detect narcotics – the canines detect humans, currency, and firearms along with narcotics. This is a further indication that this information is not material to an effort to establish the checkpoint or the use of canines is for narcotics apprehension.

E.   *Possession, Custody or Control*

Fed.R.Crim.P. 16(a)(1)(E)(i) requires the government to disclose documents or data within its possession, custody, or control. "The rule does not require the government to create documents [or data] that may provide information a defendant desires to obtain, nor

---

[14]Moreover, the Supreme Court has stated that an "alert by a reliable canine can provide probable cause." *Florida v. Harris*, 133 S.Ct. 1050, 1058-59 (2013); *see also United States v. Lingenfelter*, 997 F.2d 632, 639 (9th Cir. 1993) (a "canine sniff alone can supply probable cause").

does it require the government to present agents or witnesses for interviews or in-court examination." *United States v. Mahon*, No. CR09–0712–PHX–DGC, 2011 WL 5006737 at *3 (D.Ariz. Oct. 20, 2011) (citing cases). The rule "triggers the government's disclosure obligation only with respect to documents within the federal government's actual possession, custody or control." *United States v. Gatto*, 763 F.2d 1040, 1048 (9th Cir. 1985).

Although any inquiry into this issue may be appropriate in some cases, *Mandel*, 914 F.2d at 1219 (a court is to consider whether a request would be unduly burdensome in light of the materiality shown), as the Court has determined the requested disclosure is not material, the Court declines to address the partys' arguments regarding whether the requested disclosure is in the possession, custody, or control of the government.

IV. *Requested Disclosure as to the Reliability of the Canines*

At the time of the briefing, the government had provided disclosure of canine training records in CR 15-938-TUC-CKJ, but not in CR 16-121-TUC-CKJ. During the hearing, counsel informed the Court the documents at issue as to Ruiz (CR 16-121-TUC-CKJ) are also at issue as to Jesus H. Morales-Armenta (CR 15-938-TUC-CKJ). The parties dispute whether this disclosure is sufficient.

The Supreme Court has stated:

> . . . The better measure of a dog's reliability thus comes away from the field, in controlled testing environments. [Footnote omitted.]
>
> For that reason, evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs. After all, law enforcement units have their own strong incentive to use effective training and certification programs, because only accurate drug-detection dogs enable officers to locate contraband without incurring unnecessary risks or wasting limited time and resources.
>
> A defendant, however, must have an opportunity to challenge such evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses. The defendant, for example, may contest the adequacy of a certification or training program, perhaps asserting that its standards are too lax or its methods faulty. So too, the defendant may examine how the dog (or handler)

- 21 -

1
2
3

performed in the assessments made in those settings. Indeed, evidence of the dog's (or handler's) history in the field, although susceptible to the kind of misinterpretation we have discussed, may sometimes be relevant, as the Solicitor General acknowledged at oral argument. . . .

*Florida v. Harris*, — U.S. —, 133 S.Ct. 1050, 1057 (2013). When a defendant seeks

discovery of a canine's history to potentially pursue a motion to suppress based on a canine's

involvement in an investigation, the Ninth Circuit has stated the government must disclose

a "'handler's log,' as well as 'training records and score sheets, certification records, and

training standards and manuals' pertaining to the dog." *United States v. Thomas*, 726 F.3d

1086, 1096 (2013); *United States v. Cedano–Arellano*, 332 F.3d 568, 570-71 (9th Cir. 2003).

Further, this Court is to determine whether a protective order or an in camera hearing is

needed to accommodate law enforcement confidentiality concerns. *Id*. at 1098. Protective

orders have been issued in both this case and in the companion case. (CR 15-938-TUC-CKJ,

Doc. 39; CR 16-121-TUC-CKJ, Doc. 47).

However, a law enforcement privilege may protect information regarding law

enforcement methods. *United States v. Rigmaiden*, 844 F.Supp.2d 982, 988 (D.Ariz. 2012)

(citing *Roviaro v. United States*, 353 U.S. 53 (1957). The Supreme Court has stated:

> We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest and protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders non-disclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the [evidence], and other relevant factors.

*Rovario*, 353 U.S. at 62. Indeed, the Ninth Circuit has recognized disclosure is not

appropriate when it would disclose investigative techniques and procedures. *United States*

*v. DiCesare*, 765 F.2d 890 (9th Cir. 1985).

Ruiz argues *Cedano-Arellano* is distinguishable from his case. Because

*Cedano-Arellano* involved a search at the border rather than a checkpoint, Ruiz argues the

issue regarding the scope and propriety of interior checkpoints was not presented to the court.

For example, *Cedano-Arellano* dealt with reasonable suspicion to search a gas tank after a

canine alerted to it. However, the same issue of reliability of the canines is at issue in this

case. The surrounding facts do not affect what documentation sufficiently establishes the

1   reliability of a canine.  Ruiz also argues *Cedano-Arellano* did not limit disclosure to only

2   those items discussed in that case.

3          The Court finds it appropriate to balance the public interest with protecting the flow

4   of information against the individual's right to prepare his defense.  As discussed in *Rovario*,

5   the Court will consider the particular circumstances of this case, taking into consideration the

6   crime charged, the possible defenses, the possible significance of the requested information,

7   and other relevant factors.

8          Markle testified as to the public interest in not fully disclosing the training manual.

9   Law enforcement is concerned full disclosure may permit reverse engineering, testing of

10  contraband and human concealment methods, or other attempts to defeat law enforcement

11  efforts by people who are smuggling people or contraband into the United States.  The

12  concern is not only as to what is contained in the documents, but that the knowledge that

13  comes with it cannot be forgotten or could be transferred to other areas of law enforcement.

14  Although the defense argues the protective orders will prevent the information from being

15  released, the Court understands the stated concern that the knowledge could inadvertently

16  be disclosed.  For example, while viewing a public canine demonstration, an innocent

17  comment regarding observations made of the physical conditions could be made without

18  even realizing the basis for the knowledge came from the protected material.

19         The Court also places significant weight on the concerns that the training techniques

20  are similar to those used by other agencies and may be used for transference to other areas.

21  In other words, it not simply the disclosure of the techniques for training canines to detect

22  hidden humans, but that the techniques may also be used to train canines for more

23  threatening items (e.g., chemical munitions) and that disclosure of the material in this case

24  may affect law enforcement efforts as to other types of criminal investigations.

25         The Court balances these interests with consideration of the crimes charged, the

26  possible defenses, the possible significance of the requested, and other relevant factors.

27  Here, Ruiz is charged with narcotic offenses.  Narcotics trafficking constitutes a danger to

28  the community.  *See United States v. Leon*, 766 F.2d 77, 81 (2d Cir. 1985) (the harm to

1   society caused by narcotics trafficking is encompassed within Congress' definition of
2   "danger" as the term is used in § 3142(g)); *United States v. Ailemen*, 165 F.R.D. 571, 596
3   (N.D. Cal. 1996) (a drug trafficker is a danger to the community).  Moreover, as to the use
4   of a canine at an immigration checkpoint, the Court recognizes  the "formidable law
5   enforcement problems" posed by the northbound tide of illegal entrants into the United
6   States. *Edmond*, 531 U.S. at 25 (quoting *Martinez-Fuente*, 428 U.S. at 551-54.

7          It appears success with his Motion to Suppress may be the strongest defense tactic
8   available to Ruiz.  However, the possible significance of the disclosure is not clear.  Dr.
9   Myers stated that the current redacted status of the documents does not allow him to get
10  enough information about the CBP detection canine training and certification program to
11  develop opinions about whether it was appropriately developed or not or to advise defense
12  counsel in a way that would help him prepare to cross-examine government witnesses on the
13  subject.  Further, he has no way to determine the validity of the evaluation methodology (i.e.,
14  he can see the categories for evaluation, but not specific details).  However, Markle testified
15  that, while the details are not provided, the redacted documents inform the defense that
16  imprinting, training for searching and indicating is covered in the training.  He also stated
17  that, even with the redactions, the reliability of a canine can be evaluated by examining the
18  entire program and processes, without going into the specifics.

19         Also relevant to the consideration is the history of the disclosure of these documents.
20  Markle testified that he was not aware that full disclosure of the CBP training documents has
21  ever been made.  Indeed, Dr. Myers did not testify that he had ever reviewed the CBP
22  training documents.  Moreover, Dr. Myers did testify that, although he had reviewed other
23  canine training materials, he has not reviewed FBI certification materials.  Based on the
24  testimony, it seems clear the CBP canine training manual would provide opportunities for
25  transference to other law enforcement training program such as the FBI canine training
26  program.

27         While the Court does not necessarily disagree with Dr. Myers's assertion that he
28  cannot completely evaluate the CBP training program without full disclosure, the Court finds

the public's interest in maintaining the confidentiality of the training records outweighs the defense interests in full disclosure. The categories in the training materials include information as to the standards employed in training/evaluating the canine at issue in this case. These documents provide information as to the performance of the canine as to the training and certification. The public's interest in non-disclosure of further unredacted material outweighs the defense's interests in accessing this information to potentially challenge the reliability of the canine.

The balance of the factors leads to a conclusion that the redactions of the canine training materials is appropriate. Markle testified regarding the concerns of the disclosing the unredacted training materials. Further, the declarations of Devaney address the law enforcement concerns with disclosing unredacted material.[15] Indeed, Devaney's September 8, 2016, declaration details precise concerns relating to the disclosure of specific exhibits. The Court finds disclosure of the redacted material, as proposed by the government, adequately balances the public interest with protecting the flow of information against the right to prepare a defense. Additionally, the Court finds it appropriate to order an unredacted copy of the first slide of H-F.2 (within Ex. 49) of the canine records be disclosed.

Accordingly, IT IS ORDERED:

1.      As the Court has stated it will review the disclosure issues *de novo*, the August 23, 2016 Order of the magistrate judge (Doc. 49) as to the Motion to Compel Disclosure (Doc. 39) is VACATED.

2.      The government having provided the I-19 checkpoint statistics as discussed by *Soto-Camacho*, the government need not disclose additional statistics or raw data as to the I-19 checkpoint. Therefore, as to checkpoint statistics discussed in the Motion to Compel Disclosure (Doc. 39) the Motion is DENIED in part and GRANTED in part. As to canine

---

[15]The declarations have been filed under seal. The Court will not discuss the details included within the declarations.

statistics discussed in the Motion to Compel Disclosure (Doc. 39), the Motion is DENIED.

3.     The Amended Motion to Compel (Doc. 62) is GRANTED IN PART AND DENIED IN PART.  The government shall provide a copy of the canine training materials to the defense with Exhibits 1-5, 15, 29, 31, and 32 and the first slide of H-F.2 (within Ex. 49) of the canine records submitted for *in camera* review unredacted.  The balance of the training materials may remain redacted as proposed by the government.  The Protective Order previously issued in this case shall apply to all disclosed canine records.

4.     The Appeal of Magistrate's Order Denying Motion to Compel Disclosure (Doc. 58) is DISMISSED AS MOOT.

5.     The parties shall notify the Court by December 1, 2016:

a.     Whether the parties prefer the hearing as to the Motion to Suppress be consolidated with the hearing as to the  Motion to Suppress in CR 15-938-TUC-CKJ.

b.     How much time is needed for the defense to review the disclosed materials; i.e., when a hearing on the Motion to Suppress should be set.

6.     Exhibits 1-4 shall be docketed with this Order.

DATED this 18th day of November, 2016.


_____
Cindy K. Jorgenson
United States District Judge



# I-19 Checkpoint Activity with Technology
### (Six Months Before)

Data originated from AGIS, ATF reporting.
Date pulled on 10/13/2016
Date Ranges are from 10/21/14 - 4/20/2015

U.S. v. Morales-Armenta



EXHIBIT 1 ADMITTED
CR 15-0958-TU



I-19 Checkpoint Activity
(Six Months After)



EXHIBIT
2   ADMITTED
CR 15-0938-TUC

## USBP Drug Seizures, Processed Subjects, and Conveyance Seizures at NGL's I-19 Checkpoint and Nearby Zones
### October 21, 2014 - October 21, 2015
*Arrest Data includes Deportable and Non-Deportable Subjects*
Data Source: EID (Unofficial) as of End of Year Dates

| | I-19 Checkpoint | | TCA Zones 38 and 47 | | TCA Zone 19 | | Nogales Station AOR | |
|---|---|---|---|---|---|---|---|---|
| | 10/21/2014 - 04/20/2015 | 04/21/2015 - 10/21/2015 | 10/21/2014 - 04/20/2015 | 04/21/2015 - 10/21/2015 | 10/21/2014 - 04/20/2015 | 04/21/2015 - 10/21/2015 | 10/21/2014 - 04/20/2015 | 04/21/2015 - 10/21/2015 |
| Total Arrests | 242 | 290 | 1,053 | 1,118 | 481 | 491 | 7,379 | 7,882 |
| Total Events | 128 | 151 | 473 | 512 | 207 | 249 | 4,232 | 4,177 |
| Immigration Related* Arrests | 181 | 230 | 968 | 1,017 | 473 | 483 | 7,275 | 7,774 |
| Immigration Related* Events | 72 | 89 | 372 | 392 | 144 | 184 | 3,921 | 3,906 |
| Narcotics Related Arrests | 65 | 56 | 116 | 116 | 17 | 33 | 178 | 201 |
| Narcotics Related Non-USC Arrests | 18 | 16 | 38 | 66 | 17 | 33 | 116 | 147 |
| Narcotics Related Events | 55 | 47 | 95 | 101 | 70 | 70 | 350 | 294 |
| Narcotics Related Events with Non-USC | 15 | 12 | 31 | 41 | 15 | 13 | 85 | 87 |
| Other Arrests (All Non-immigration*) | 61 | 60 | 85 | 101 | 8 | 8 | 104 | 108 |
| Conveyance Seizures | 64 | 82 | 82 | 106 | | | 108 | 134 |
| Marijuana Pounds | 1,080.74 | 1,316.59 | 7,110.55 | 8,425.60 | 10,233.85 | 9,465.32 | 30,976.73 | 32,043.64 |
| Cocaine Pounds | 97.57 | 13.20 | 97.57 | 13.20 | | | 97.60 | 13.21 |
| Heroin Pounds | 67.01 | 4.02 | 67.01 | 4.02 | | | 67.03 | 4.02 |
| Methamphetamine Pounds | 82.40 | 31.25 | 82.40 | 31.26 | | | 85.44 | 34.15 |
| Ecstasy Pounds | | | | | | | | |
| Other Drug Pounds | 0.02 | 0.65 | 0.02 | 0.65 | | | 0.02 | 0.65 |
| Total Drug Pounds | 1,327.74 | 1,365.72 | 7,357.55 | 8,474.73 | 10,233.85 | 9,465.32 | 31,226.82 | 32,095.67 |
| FMUA Apprehensions | 4 | | 11 | 7 | 4 | 1 | 138 | 142 |
| Single Adult Apprehensions | 97 | 125 | 835 | 836 | 441 | 458 | 6,334 | 6,610 |
| UAC Apprehensions | 7 | 6 | 40 | 53 | 28 | 24 | 701 | 862 |
| Total Apprehensions | 108 | 131 | 886 | 896 | 473 | 483 | 7,173 | 7,614 |

*Immigration Related include events with at least one of the following criteria:
- Incident type of AAS or CAS
- Includes a deportable alien
- Includes a subject presented for prosecution on an 8 USC 1324 charge



EXHIBIT 3 ADMITTED
CR15-0938-TUC

## USBP Drug Seizures, Processed Subjects, and Conveyance Seizures at NGL's I-19 Checkpoint and Nearby Zones
### June 15, 2015 - June 14, 2016
*Arrest Data includes Deportable and Non-Deportable Subjects*
*Data Source: EID (Unofficial) as of End of Year Dates*

| | I-19 Checkpoint | | TCA Zones 38 and 47 | | TCA Zone 19 | | Nogales Station AOR | |
|---|---|---|---|---|---|---|---|---|
| | 06/15/2015 - 12/14/2015 | 12/15/2015 - 06/14/2016 | 06/15/2015 - 12/14/2015 | 12/15/2015 - 06/14/2016 | 06/15/2015 - 12/14/2015 | 12/15/2015 - 06/14/2016 | 06/15/2015 - 12/14/2015 | 12/15/2015 - 06/14/2016 |
| Total Arrests | 305 | 277 | 1,213 | 1,156 | 561 | 761 | 7,576 | 7,327 |
| Total Events | 163 | 155 | 576 | 518 | 279 | 370 | 3,946 | 4,109 |
| Immigration Related* Arrests | 240 | 217 | 1,110 | 1,061 | 545 | 745 | 7,448 | 7,209 |
| Immigration Related* Events | 97 | 87 | 447 | 404 | 208 | 275 | 3,658 | 3,799 |
| Narcotics Related Arrests | 58 | 63 | 115 | 136 | 27 | 22 | 210 | 212 |
| Narcotics Related Non-USC Arrests | 18 | 17 | 65 | 65 | 27 | 22 | 150 | 125 |
| Narcotics Related Events | 49 | 64 | 65 | 65 | 66 | 91 | 292 | 322 |
| Narcotics Related Events with Non-USC | 13 | 12 | 108 | 111 | 11 | 11 | 84 | 59 |
| Other Arrests (All Non-immigration*) | 65 | 60 | 41 | 29 | 16 | 16 | 128 | 118 |
| Conveyance Seizures | 79 | 70 | 100 | 95 | | 1 | 139 | 132 |
| Marijuana Pounds | 1,016.97 | 1,722.03 | 9,459.47 | 7,879.71 | 8,829.55 | 12,304.94 | 35,490.61 | 32,339.09 |
| Cocaine Pounds | 66.50 | 38.95 | 66.50 | 38.95 | | 0.00 | 66.50 | 69.04 |
| Heroin Pounds | 4.02 | 32.23 | 4.02 | 32.24 | | | 4.02 | 32.23 |
| Methamphetamine Pounds | 23.36 | 107.49 | 23.36 | 107.51 | | | 28.00 | 131.56 |
| Ecstasy Pounds | | | | | | | | |
| Other Drug Pounds | 0.65 | 59.58 | 0.65 | 59.58 | | | 0.65 | 61.99 |
| Total Drug Pounds | 1,111.50 | 1,960.28 | 9,554.00 | 8,117.99 | 8,829.55 | 12,304.94 | 35,589.78 | 32,633.91 |
| FMUA Apprehensions | | 1 | 9 | 8 | | 2 | 157 | 187 |
| Single Adult Apprehensions | 134 | 138 | 913 | 895 | 509 | 690 | 6,228 | 6,047 |
| UAC Apprehensions | 9 | 9 | 68 | 59 | 36 | 52 | 911 | 836 |
| Total Apprehensions | 143 | 148 | 990 | 962 | 545 | 744 | 7,296 | 7,070 |

*Immigration Related include events with at least one of the following criteria:
- Incident type of AAS or CAS
- Includes a deportable alien
- Includes a subject presented for prosecution on an 8 USC 1324 charge



EXHIBIT 4 ADMITTED
CR15-038-TUC