**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,  ) | |
| Plaintiff,  ) | No. CR 16-121-TUC-CKJ |
| vs.  ) | **ORDER** |
| Jose Antonio Ruiz,  ) | |
| Defendant.  ) | |

Pending before the Court is the Motion to Suppress (Doc. 34) filed by Jose Antonio Ruiz ("Ruiz").  A Response (Doc. 37) and a Reply (Doc. 38) have been filed.  Evidence and argument were presented to the Court on February 14 and 15, 2017.  Additionally, evidence has previously been presented in this case on October 25, 2017.

I.  *Factual and Procedural History*

A.  *Summary of Testimony of Agent Delfina Scarlet Cruz*

Customs and Border Patrol ("CBP") Agent Delfina Scarlet Cruz ("Agent Cruz"), who has been a CBP agent for 11 years,  is stationed at the Nogales Border Patrol station.  She is sometimes assigned to checkpoint duty.  On checkpoint duty, she works at the I-19 checkpoint just north of Tubac, Arizona.[1]

When assigned to the primary area of the I-19 checkpoint, Agent Cruz stands in the

---

[1]Another witness testified that the I-19 checkpoint is in the Tucson Sector and it is manned by the Nogales station.

traffic lanes as the vehicles approach and interacts with the people in the vehicles.  She has been trained to observe the body language of the drivers/occupants traveling through the checkpoint (e.g., sweaty, grabbing the steering wheel, evading eye contact).  Her duties at the primary area include establishing the immigration status of the people in the vehicles.  For those persons Agent Cruz recognizes (e.g., commuters), she does not ask them if they are United States citizens.  The secondary area is off to the side for referral of vehicles that need further inspection or for follow-up questioning.  The secondary inspection area is used to prevent backing up the traffic, which may create a hazard; referral to secondary does not necessarily mean that someone is in trouble – it is just to keep everything safe.

At approximately 9:50 a.m. on December 14, 2015, Agent Cruz was stationed at the I-19 checkpoint, assigned to the primary area.  She remembers a black Tundra following the speed cautions traveling towards her.[2]  She looked to CBP Canine Agent Ned Phillip Ewing ("Agent Ewing") as the vehicle passed him and he gave Agent Cruz a hand signal which indicated the vehicle needed to be inspected at secondary.  She was paying attention to the handler and does not recall seeing the canine doing anything.  When the Tundra pulled up to Agent Cruz, she asked the driver, Jose Antonio Ruiz ("Ruiz"), to please move to the secondary inspection area.  Ruiz complied.

Agent Cruz has not received any training on how to recognize canine cues, but her interaction with fellow agents has allowed her recognize canine cues.  It is not her job to pay attention to the canine; Agent Cruz pays attention to the canine handler.

Agent Cruz did not keep any notes regarding this encounter.  She believes the United States Attorney's office asked her to write a report; the agent drafted her report regarding this incident on February 11, 2016.  Between December 14, 2015, and February 11, 2016, Agent Cruz was assigned to one of the primary traffic lanes of the I-19 checkpoint several times per week.  A large percentage of the vehicles she sees while assigned there are trucks.  During four hours assigned to the primary area out of a ten hour shift, the agent sends approximately

---

[2]Agent Cruz identified Ruiz as the driver of the Tundra.

12 cars a day to the secondary inspection area.  Agent Cruz did not dispute a question that concluded that she has sent hundreds, if not thousands of cars, to the secondary inspection area.  Agent Cruz does remember another car, a gold Nissan, for which she was the primary agent and a case resulted.

She remembers interacting with Drug Enforcement Administration ("DEA") "BANG" agents on that day which is why, along with the large quantity of cocaine, this case stands out to her.

B. *Summary of Testimony of Officer Bevan Anderson*

Immigration Customs Enforcement ("ICE") Officer Bevan Anderson ("Officer Anderson") had been an agent with Border Patrol for over five years.  While with the Border Patrol, he usually worked at the I-19 checkpoint.  When assigned to the primary area, he was responsible for asking the country of citizenship for the persons who traveled through the checkpoint.  When assigned to the secondary inspection area, he would inspect the vehicles, question people, and verify immigration documents; this included vehicles with a lot of people in them (e.g., large vans, buses).  Officer Anderson was also assigned to operate a ZBF, which is an x-ray van.  Using the ZBF, Officer Anderson finds organic material – he has found illegal narcotics, food, water, chemicals, and humans.

On December 14, 2015, Agent Ewing used his service radio to indicate the vehicle was being sent to secondary because the canine had alerted to it.  Officer Anderson does not recall having any interaction with Ruiz; he believes he would recall if there had been any interaction.  Officer Anderson recalls scanning a black pickup on December 14, 2015.  He recalls this because it was his last day or second to the last day on shift with Border Patrol.

Officer Anderson realized he had scanned a similar truck a couple of days prior to December 14, 2015, and noticed there was a difference between the two vehicles.[3]  At that

---

[3]Officer Anderson had entered the prior scanning into the system, which is standard operating procedure for Border Patrol, as a reference point.

point, Officer Anderson had been working secondary for about two and a half years. In his experience, most anomalies turn out to be illegal narcotics. Officer Anderson further noticed multiple packages secreted on the driver's side and on the passenger side.[4] He believes the time to take the truck to the scanning area, scanning the truck, and returning the truck to back under the checkpoint awning should have taken less than five minutes. Officer Anderson informed Agent Ewing that he saw anomalies in the "beds."

C. *Summary of Testimony of Agent Ned Ewing*

Agent Ewing has worked with Border Patrol for about 12 and a half years, off and on since 2000. He is a canine handler; canine Niky is assigned to Agent Ewing. Agent Ewing graduated from the canine academy, which lasted about five or six months, in 2009 and Niky has been with him ever since. As a CBP agent, Agent Ewing also has experience with checkpoint primary, checkpoint secondary, line watch, detention, and casework duties.

The canine academy program Agent Ewing participated in lasted seven or eight weeks. The program included two weeks of classroom, assignment of a canine, approximately five weeks of working with green sheets (performance canine handler detection score sheets) with Niky, learning other material, and a final exam. Prior to Niky's assignment to Agent Ewing, Niky was selection tested and worked with instructors at pre-training for approximately seven weeks. The green sheets have to be passed by the team with a score below 3.55. A three is average, a two is above average, and a one is excellent. After the final exam was taken, Agent Ewing and Niky also went through a one week certification testing process. Certification is conducted by either Border Patrol agents or contract instructors. Yellow sheets (detection canine combined performance review), which is a quarterly evaluation of the combined green sheets and an evaluation of the instructor, are also utilized. When Agent Ewing is given a search area, Niky stays in one location while Agent Ewing walks the search area to look for hazards, safety issues, and to get an idea how the

---

[4]Officer Anderson testified he believed there were 22 packages in total.

area should be searched.  No one talks to Agent Ewing during this time; usually the instructor stays with Niky.  Agent Ewing is not advised of where the search items are located; it would defeat the purpose if he was pre-advised of their locations.  The instructor knows the location(s) of the source of the odors.

Every two weeks, Agent Ewing and Niky complete eight hours of green sheets.  They are evaluated quarterly with the yellow sheets.  Agent Ewing and Niky are required to be re-certified annually.[5]  Niky has never failed a green sheet, a yellow sheet, or a certification, although there have been periods where Niky has been sick or having "off days."

Niky is trained to detect concealed humans and the odors of marijuana, heroin, cocaine, methamphetamine and their derivatives.[6]  The daily assignment of Agent Ewing and Niky is the I-19 checkpoint.  However, they also take calls out in the field.  In the eight year period Agent Ewing and Niky have been assigned to the I-19 checkpoint, Niky has detected concealed humans, marijuana, methamphetamine, heroin, and cocaine at the checkpoint and in the field.  Niky will "alert" (change in body posture, increased respiration) when he first encounters an odor he has been trained to detect.  However, these body changes may be the result of interest in other dogs or food.  Niky will provide an "indication" (sit) when he locates the source of a trained odor.  If Agent Ewing verifies an alert or an indication, he provides a reward to Niky.

Safety is always a concern while working the I-19 checkpoint.  There are signs reducing the 75 mile an hour speed limit, but some people do not slow down.  Additionally, some drivers are distracted and there is traffic flowing on the southbound lanes.

Agent Ewing and Niky were assigned traffic check at the I-19 checkpoint on December 14, 2015.  Agent Ewing worked the primary area with Niky, allowing him to work freely in the two lanes of traffic with the vehicles passing them.  It was an overcast day with

---

[5]Agent Ewing and Niky were completing their annual certification the week of the hearings in this case.

[6]Niky does not alert to the vehicles, drivers, or passengers.

a northbound wind.  The northbound wind at the I-19 checkpoint usually causes a trained odor to come towards a detection canine.  On that day, two lanes of traffic were open.  While Agent Ewing and Niky were between the two lanes a black Tundra approached.[7]  As the middle to back part of the truck passed them, Niky alerted – his body posture changed, he began sniffing very intensely tying to trace the odor to its source.

Agent Ewing asked Agent Cruz, who was in the far west lane, via the radio to hold traffic.  As it was a windy day and Niky had alerted, Agent Ewing wanted to determine the source of the alert.  He did not believe Agent Cruz had heard him, so he walked around the back of the truck, made eye contact with Agent Cruz, and made a fist (which means to hold traffic).  Agent Ewing then made a number two signal (holding up two fingers) to Agent Cruz, indicating to Agent Cruz to send the vehicle to the secondary inspection area because of a canine alert.  Niky did not make an active indication while in the primary area.  Agent Ewing also testified that Niky did not bark while in the primary area.

Approximately three to five minutes later, Agent Ewing went to secondary.  This affords an x-ray operator time to conduct an x-ray of the vehicle.  Agent Ewing usually walks to the area to afford Niky an opportunity to again sniff the air of the vehicle.  Ruiz was in the waiting area.[8]

Agent Ewing and Niky did a secondary walk around the Tundra.  Agent Ewing noticed the back wheel well on the passenger side appeared to have some after-market tampering that was not consistent with any other Tundra he had ever seen.  Niky again alerted to the truck; although he did not indicate, Niky was "all over" the bed of the truck.  The wind, temperature, and humidity impact a canine and his detection abilities.  Officer Anderson advised Agent Ewing of anomalies observed from the x-ray.  Agent Ewing kenneled Niky.  Agent Ewing and Officer Anderson decided to place the Tundra under the

---

[7]The location of the canine team was drawn on Exhibit 2.  However, this Exhibit was not admitted into evidence.

[8]Agent Ewing identified Ruiz as the occupant in open court.

1    canopy near the primary inspection area to further inspect and search the Tundra.

2         Another agent found access to a compartment.  After the packages had been removed

3    from the Tundra and the content was tested and verified, Agent Ewing brought Niky back

4    to the odor.  Niky alerted to the back, middle part of the truck.  Agent Ewing rewarded him.

5    Agent Ewing also testified that Niky barked at the end, which is an aggressive indicator

6    which is not trained.  Agent Ewing's report did not include reference to a reward, an

7    indication, or a bark.  Over 53 pounds of cocaine was seized.

8         Some of the reviews, called green sheets, and yellow sheets were admitted into

9    evidence.  *See* Ex. 1.  They include separate scores and instructor comments for both Agent

10   Ewing and Niky.  Agent Ewing did receive one 4 regarding his voice tone.  However, Agent

11   Ewing also scored perfect on ritual and received a lot of 2s.  In over 30 evaluations referred

12   to by the Assistant United States Attorney ("AUSA") that included 132 separate location

13   evaluations, Agent Ewing only received the one 4 and Niky had only one 4 for control and

14   one 4 for indication.

15        If a canine team has a continual problem, the instructors would work with the canine

16   handler and the canine to rectify the problem.  If the problem is not resolved, they would go

17   through another week of training and green sheets to work on just that problem.  Remedial

18   training consists of 40 hours.  The canine team would retain its certification, but would be

19   assigned to the canine office for a week.  If the problem persists, certification may not be

20   reissued.

21

22   D.  *Summary of Testimony of Agent Alex Markle*

23        Border Patrol Agent Alex Markle ("Agent Markle") joined the Border Patrol in

24   January of 1998.  He was selected to be a canine handler in 2005.  In 2008 he became an

25   instructor with the Border Patrol.  In 2015, Agent Markle was promoted to Course Developer

26   Instructor Supervisory Border Patrol Agent at the Canine Center in Front Royal, Virginia,

27   for the CBP Canine Program; he currently remains in that position.  Agent Markle has been

28   certified previously as a canine handler for other government agencies.  Additionally, he has

1   a law degree and was a Special Assistant United States Attorney from 2013-2015.  Agent

2   Markle has not received any education outside of his CBP experience as to canine

3   physiology, canine neurophysiology, or veterinarian medicine.

4          Agent Markle's current duties include the selection and testing of new canines for

5   purchase by the CBP Canine Program.  He also evaluates canines and provides initial training

6   of canines.  Agent Markle trains students with the canines in a seven week program as well

7   as training instructor students in a 12 week course.  He conducts certification testing of

8   students in the detection of concealed humans and the odors of controlled substances.  Agent

9   Markle has developed some of the protocols used to train other instructors; these are based

10  on the knowledge and experience he acquired through working with the CBP Canine

11  Program and his educational background (e.g., courtroom testimony, report writing).

12  Matthew B. Devaney, the Research and Development Coordinator of the CBP Canine

13  Program, developed the current curriculum for training the detector canines for the CBP –

14  Agent Markle implements and improves the curriculum.  CBP attempts to follow the best

15  practices included in a list put out by the Scientific Working Group on Dog and Orthogonal

16  Detector Guidelines ("SWGDOG") regarding the maintenance of records, certification,

17  maintenance training, training aids, and field practices.  Agent Markle believes CBP has

18  adopted the best practices or has acknowledged them and recognized they are appropriate.

19  In other words, CBP has been using the same recommended processes or has modified

20  processes in response to the recommendations.  SWGDOG includes a lot of experts in the

21  canine field.  SWGDOG views a single blind method as the best practice for comprehensive

22  team assessments for certifications.  Individual Border Patrol agents have been certified by

23  and/or joined that organization.

24         The CBP Canine Program designed the performance standard score sheet, i.e., the

25  green sheet.  The form has been modified slightly over the years.  The goal of the form is to

26  evaluate the handler and the canine; it also ensures appropriate testing is conducted through

27  a multitude of environments as well as to identify and document any problems that may be

28  occurring.  The first seven columns focus on the handler, the next five columns focus on the

canine, and the next seven columns are the actual search criteria.  Agent Markle summarized the columns, rituals, and search skills included in the green sheets.  A scale grading system is used to help identify issues and more accurately describes the performance of a canine team than a simple pass/fail system.

If a canine team does not average 3.5, different results may occur.  For example, if it occurs during a certification, the team fails certification and they must go through remedial training.  If a 3.5 score or above occurs in a bi-weekly evaluation, the handler is advised of the situation and should take steps to correct the problem prior to the next training day; if the handler fails to do so, it will be apparent in the next training session.

CBP wants well-trained canine handlers and canines as a point of pride and to ensure that people's constitutional rights are not negatively affected by a canine team that is not up to standard.

Agent Markle had an opportunity to review the green sheets and the yellow sheets of Agent Ewing and Niky.  After that review, Agent Markle concluded Agent Ewing and Niky were a very experienced team, appeared to be very proficient, and worked very well together.  As to the December 14, 2015, incident in this case, Agent Markle praised Agent Ewing's request for the traffic to be held.  Additionally, Agent Ewing's testimony indicated to Agent Markle that he knew Niky was alerting to the vehicle – specifically, to the rear of the vehicle, but without any more precision.

Canines may not indicate for a variety of reasons:  limited space, an overwhelming odor (the odor is everywhere), or a moving source (traffic).  Even if a canine is trained with a passive alert, the canine may use an active indicator if it is frustrated; i.e., unable to passively indicate.

CBP uses a single blind method of evaluation.  In other words, the instructor knows where the items are hidden, while the canine handler and the canine do not.  This mitigates a canine possibly reading cues from the canine handler (e.g., providing hints as to where the handler desires a canine to indicate).  A comprehensive assessment of both the canine handler and the canine are being conducted – the evaluator needs to know the location or absence of

1  the training aid to effectively complete that evaluation.  It is not possible to use a double

2  blind method of evaluation if a complete team assessment is being conducted; Agent Markle

3  clarified this on cross-examination:  the use of a video would make the use of a double blind

4  evaluation method possible, but it would not be effective.  If a double blind method of

5  evaluation was used, rewards to the canine might be inappropriately withheld (i.e., no one

6  present would be aware a reward should be given), which could cause the canine to become

7  frustrated or confused with a diminished performance as the result.  If CBP were only doing

8  an odor recognition assessment, a double blind method could be used.

9  Agent Markle is not aware that there is a consensus in the field of detector dogs across

10  the country that a certification should be double blind.  During the initial

11  training/certification process, the CBP Canine Program utilizes a barrier that prevents the

12  canine handler and the canine from seeing the instructor, while allowing the instructor to see

13  the exercise.  Agent Markle distinguished between the initial training/certification process

14  and the maintenance training.  As stated by Agent Ewing, during the maintenance training,

15  the instructor stays close enough to evaluate the canine team.  Agent Markle clarified that the

16  instructor varies his conduct so the canine team cannot cue in or read the instructor's actions

17  (e.g., walk through the search, stand back, use a loud tone of voice).

18  Agent Markle does not believe he was present at the initial certification or re-

19  certifications of Agent Ewing and Niky.  He cannot testify as to what the specific instructors

20  did or how faithful they were in following the precautionary measures.  Agent Markle

21  testified regarding other aspects of the training curriculum.

22  The CBP Canine Program does not train canines to bark with an indication, but some

23  canines do.

24  To the best of his knowledge, a complete unredacted copy of the curriculum is not

25  provided to defense counsel in San Diego, California, where he practiced as a Special

26  Assistant United States Attorney.  He believes partially redacted green sheets are disclosed

27  in San Diego.

28  When asked if he had ever heard of any cartel or anyone else using reverse

- 10 -

engineering with unredacted canine records to subvert CBP's processes, Agent Markle stated he was aware of some things cartels had done in response to the uses of canines in the detection area.   Agent Markle cited examples of specific packaging and placements. However, he did state that he cannot make a direct connection between the cartel practices and the CBP processes.

During rebuttal examination, Agent Markle stated a canine exhibits a specific behavior when it encounters a trained odor.  A canine does not exhibit the same behavior when it encounters other odors of interest.  The training of the canine handler includes the ability to recognize the different behavior.

CBP is one of the largest organizations that use canines.  It has over 1500 canines nationwide and elsewhere (including Puerto Rico, the U.S. Virgin Islands and overseas evaluating cargo prior to its entry into the United States.

E.  *Testimony of Dr. Lawrence Jose E. Myers*

The educational background of Lawrence Jose E. Myers, D.V.M., Ph.D., ("Dr. Myers") includes a Bachelor of Science (wildlife ecology), a Master of Science specializing in ethology (animal behavior), a Ph.D. in neurophysiology, and a doctor of veterinarian medicine. Ex. 31.  In 1982, Dr. Myers became a faculty member at Auburn University teaching primarily veterinarian students and graduate students.  As a tenure track faculty member, he was also expected to do research – Dr. Myers did research on sensory function and detector dogs in 1982.  He has conducted research into detector dogs for approximately 35 years and continues to do so to this day.  Dr. Myers has authored papers on sensory function, evaluation of various detector dog programs, the chemistry of various target substances, etc.  He has also chaired conferences that involve the gathering of professional and experts in this field. Dr. Myers has evaluated certification programs of organizations that use detector canines.  He has also assisted in developing certification processes.  He has taught short courses, which may or may not be included in his CV, relating to canine training.

Dr. Myers' curriculum vitae ("CV") is an academic CV.  Since his testimony during

the October 2016 hearing, Dr. Myers has attempted to update his CV; however, he did not want to incorrectly include items so items for which he no longer has records are not included.  The AUSA reminded Dr. Myers of his October 2016 testimony in which he stated he could not be evaluated as an expert after 2008 because of an incomplete CV.[9]  Dr. Myers has provided additional material as well as he could, but stated he no longer has some of the records to provide additional information.[10]

Dr. Myers did not dispute the AUSA's pointing out where the CV does not include references to canine training and canine handling.  Of about 38 articles Dr. Myers participated in , only two times (in 1992 and 2001) were they specifically related to canine training or canine handling.  Out of about 22 abstracts, only one (in 1992) relates to detection odors for canines; Dr. Myers points out that others deal with thresholds for various chemicals.  About 49 presentations are listed in the CV, but do not provide information regarding Dr. Myers' involvement.

Dr. Myers consulted with the National Association for Criminal Defense Lawyers and the Rutherford Institute in their preparation of amici briefs in *Florida v. Harris* and *Florida v. Jardines*.  Dr. Myers agrees with the statement from *Florida v. Jardines* that, in effect, a study addressing the double blind method ("the Davis study") should not be used to support blanket arguments that alerts by trained canine do not support probable cause for subsequent searches.

Dr. Myers has testified in about 40 cases in the last 25 years.  He has also consulted in additional cases in which he did not testify.  Dr. Myers has testified or consulted for both defense and prosecuting entities.  Specifically, he has testified for one California prosecuting agency, involving a 1992 drug case.  His CV lists about 20 of the cases, but does not provide

---

[9]Dr. Myers' original CV was admitted into evidence during the October 25, 2016, hearing.  Ex. 31.

[10]After providing the updated CV, Dr. Myers was not requested to provide further information.

1     citations that would afford the AUSA an opportunity to identify the cases.

2           Dr. Myers does not have any training in dog handling, does not have any training in
3     the curriculum to develop a canine handling program, and has never trained or evaluated law
4     enforcement canine  handlers.  He provided a short course to Border Patrol (regarding
5     scent/olfactory ability of canines) that did not include training canines, training canine
6     handlers, or reviewing or development CBP curriculum.  Dr. Myers' experience includes
7     panel discussions, speaking engagements, and chairing conference related to detector canines
8     (e.g., including discussions related to canine reliability and training).  Dr. Myers' indicated
9     that some of these types of conferences do not occur as frequently/regularly now as they used
10    to.

11          Dr. Myers reviewed incident documents, a redacted copy of the curriculum including
12    section testing, a note taking guide, a transcript of testimony of Markle, a handwritten
13    description of the certification process, and certification documents relative to Agent Ewing
14    and Niky.  Dr. Myers also listened to the prior testimony presented during the hearing on the
15    Motion to Suppress.

16          A single blind procedure, as it relates to detector dog work is a situation where the
17    handler and the dog did not have any hint of a presence or location of a target and the
18    observer does know where a target might be found.  A double blind procedure is a procedure
19    where there may be an observer or a video, along with the dog and the handler.  In other
20    words, no one knows if or where any target might be in a search area.

21          Dr. Myers opines that, in a certification for reliability procedure, an agency should use
22    a double blind method.  This is because there is a distinct possibility of inadvertent cuing of
23    a canine so a false result could be produced.  Although there might be a false result with a
24    double blind method, it would not be a systemic problem.  The double blind method is the
25    valid measure of reliability.  This has been the opinion of behavioral scientists for almost 100
26    years; it has been borne out repeatedly in peer review publications and is the standard
27    operating procedure.  The Real Detector Dog Organization uses this method routinely and
28    a few other organizations are moving towards this method.  To the best of his knowledge,

SWGDOG has changed its position to double blind certification being the best practice for purposes of determination and reliability.  When the AUSA referred to a 2016 SWGDOG document that indicated SWGDOG had always had a preference for single blind tests as an adequate way to test the reliability of a canine, Dr. Myers referred to a hard copy he has at home.  He did not provide a copy of the document to defense counsel and stated it was not for 2016.[11]

As to both maintenance and training, Dr. Myers opines that some of the searches must be double blind, but that a certain portion could be single blind.  If all of the searches are single blind, the method is insufficient to ensure reliability – it cannot be certain if the performance is based, or partially based, on inadvertent cuing.

Dr. Myers opines that, as to certification, a double blind method should always be used.  Certification for the integrity or operational efficiency of the canine team can be single blind. Operational efficiency addresses, for example, time and space efficiency – this would not necessarily have a bearing on reliability.  However, a canine cannot be rewarded if no one knows the canine acted correctly.  Further, an observer can take actions (e.g., stepping out of view) to minimize cuing.

A canine alert is an expression of interest – there is an odor of interest.  What CBP refers to as an indication is a final trained response.  Historically, an alert includes both the expression of interest and the indication (based on the military working dog program, most police agencies Dr. Myers has worked with, the U.S. Secret Service, the United Kingdom Air Force, the Irish Constabulary, the United Kingdom Army, and a California case).  A final trained response is important because canines may become interested in both trained odors and other odors.  When Dr. Myers was consulting for the preparation of the amici brief in *Florida v. Harris*, he referred to an alert to include a final trained response.  Dr. Myers had helped developed the system used by the Florida Department of Law Enforcement ("FDLE"),

---

[11]The government did not move to admit the 2016 document the AUSA indicated he had in his possession.

the agency at issue in *Florida v. Harris*. FDLE's system demands a final trained response.[12] For a canine to provide his handler reliable information, a final trained response is required.

Niky's bark during the reward is not significant because Niky could just as likely have been frustrated because of the wind or because he expects an odor but cannot find one.

Dr. Myers has analyzed frame by frame canine teams – handlers anticipating something slow or stop before a canine stops and sits. In other words, the canine is reading the handler and not responding to potential odors in single blind searches. Dr. Myers believes this is usually inadvertent cuing on the part of the canine handler or observer. The only way to avoid cuing is double blind testing. However, when both the canine handler and the canine do not know where drugs have been hidden during testing for reliability, the cuing issue is mitigated.

Dr. Myers does not believe the "alert" exhibited by Niky at the Tundra is reliable. An odor of interest or a trained odor might have been from another vehicle or something could have blown in the wind that had nothing to do with the vehicles at the checkpoint. Dr. Myers agrees that many odors at a checkpoint may be of interest to canine. Further, in some situations a canine cannot indicate (e.g., overwhelming odor, space). Moreover, the goal of the canine is to hopefully find a trained odor and get a reward from the canine handler. In other words, a canine will not "willy-nilly" alert to anything because a potential reward is on the line.

The December 14, 2015, incident presents a double blind situation. However, if the driver of the Tundra knew there were drugs in the vehicle, a single blind situation is presented. There is nothing the government can do to mitigate any cuing from such a driver. Unless a driver has hinted the presence of drugs to a canine handler, the driver's absence from the vehicle makes the situation at least somewhat double blind. Dr. Myers has never been to a Border Patrol checkpoint and has never seen canines work at the primary or secondary areas at a Border Patrol checkpoint. He has discussed the roles and

---

[12]Dr. Myers' CV does not include reference to this consultation.

responsibilities of a canine at a Border Patrol checkpoint with Clark Larson, Devaney's predecessor, and probably other CBP trainers and handlers.

Dr. Myers agrees the green sheets and yellow sheets include an extensive and comprehensive list of evaluating criteria and cannot name another criteria that should be evaluated. However, the criteria is not significant if the methodology is not up to standard. The scoring scale of one to six is better than a pass-fail system. Dr. Myers' belief that SWGDOG recommends a double blind method is not the only reason for opining such a method is needed for reliability; Dr. Myers believes behavioral experimental requirements supports the conclusion.

F.  *Indictment and Motion to Compel*

On January 13, 2016, Ruiz was indicted on one count of Conspiracy to Possess with Intent to Distribute Cocaine and one count of Possession with Intent to Distribute Cocaine.

Ruiz filed discovery motions seeking checkpoint statistics, canine training materials, and canine records. The Court recognized the government had provided the requested I-19 checkpoint statistics to Ruiz and ordered the requested canine statistics need not be disclosed as they were not material. The Court also ordered disclosure of canine training materials and records, some redacted and some unredacted.

II.  *Relevant Statistics Provided by the Government*

In its Order addressing the Motion to Compel Disclosure, the Court reached statistical findings at the I-19 checkpoint. (Doc. 84). The Court summarizes those findings here. During a one year period around the arrest of Ruiz there were a total of 582 (305 + 277) arrests. Of these arrests, 457 (240 + 217) of the arrests were immigration related and 121 (58 + 63) of them were narcotics related.[13] 35 (18 + 17) of the narcotics related arrests involved

---

[13]The Court's references to narcotics herein includes non-narcotic illegal drugs (e.g., marijuana).

non-United States citizens; these narcotics arrests are also included in the immigration arrests if they involved a deportable alien.  This means there were approximately 86 (121-35) United States citizen narcotics related arrests.[14]  Additionally, there were a total of 125 (65 + 60) non-immigration arrests (this includes narcotics events and other crime events).  During the same period, there were a total of 318 (163 + 155) events – 184 (97 + 87) of them were immigration related and 113 (49 + 64) of them were narcotics related, with 25 (13 + 12) of the narcotics related events involving non-United States citizens.  (*See* Doc. 84, Ex. 4).

This means, at the I-19 checkpoint from June 15, 2015 through June 14, 2016, 78.5% of the arrests were immigration related, 72.5 % of the arrests were only immigration related arrests (not including any overlap with narcotics related arrests)[15], and 21.5% of the arrests were non-immigration related.  The narcotics related arrests involving United States citizens (i.e., not immigration related at all), constituted 14.8% of the total arrests.  Additionally, 57.9 % of the events were immigration related and 35.5 % of the events were narcotics related (this includes some overlap with deportable aliens).

Statistics from the nearby area zones show the activity that occurs at the I-19 checkpoint is similar, but with less immigration related events compared to narcotics related events in those other areas.  *See* Ex. 4.  For example, during the same time period, 91.6% of the arrests in Zones 38 and 47 were immigration related and 97.6% of the arrests in Zone 19 were immigration related.  (*See* Doc. 84, Exs. 1-2, 4).

III.  *Constitutionality of Immigration Checkpoints in General*

A seizure occurs when a vehicle is required to stop at a checkpoint.  *See e.g. United States v. Fraire*, 575 F.3d. 929, 931 (9th Cir. 2009).   While a seizure is normally

---

[14]"Approximately" was used because the testimony did not establish that non-United States citizens were necessarily deportable aliens.

[15]To calculate this percentage, the Court reduced the number of immigration related arrests (457) by the number of narcotics related non-USC arrests (35).  The remaining 422 arrests constitutes 72.5% of the total arrests.

unreasonable absent individualized suspicion, the United States Supreme Court has recognized that in certain situations, including some vehicle checkpoints, individualized suspicion is not required. *Id.* (citing *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000)).

The Supreme Court has determined that the government's legitimate interests advanced by a temporary seizure at an immigration checkpoint outweigh the minimal intrusion on a motorist's privacy. *United States v. Martinez-Fuerte*, 428 U.S. 543, 561-62 (1976); *Edmund*, 531 U.S. at 37 (citing *Martinez-Fuerte*) ("We have also upheld brief, suspicionless seizures of motorists at a fixed Border Patrol checkpoint designed to intercept illegal aliens[.]"). The Court stated that it was holding "that stops for brief questioning routinely conducted at permanent checkpoints are consistent with the Fourth Amendment and need not be authorized by warrant." 428 U.S. at 566. As the Ninth Circuit Court of Appeals has summarized, immigration checkpoints are constitutional when they are "limited to a few brief questions about immigration, the production of immigration documents, and a 'visual inspection of the vehicle . . . limited to what can be seen without a search.'" *United States v. Preciado-Robles*, 964 F.2d 882, 884 (9th Cir. 1992) (quoting *Martinez-Fuerte*, 428 U.S. at 556-558). Moreover, a motorist may be referred to a secondary inspection area for further immigration questioning "in the absence of any individualized suspicion." *Martinez-Fuerte*, 428 U.S. at 562. Furthermore, the Supreme Court has stated that its decision in *Edmond* cannot be characterized "as holding that the 'use of a drug-sniffing dog . . . annuls what is otherwise plainly constitutional under our Fourth Amendment jurisprudence.'" *Edmond*, 531 U.S. at 45, n. 1; *see also United States v. Place*, 462 U.S. 696, 707 (1983) (the investigative technique of a limited canine sniff by a well-trained narcotics detection dog is less intrusive than other investigative techniques).

The Ninth Circuit has set forth a two-step analysis to determine whether a checkpoint set up by law enforcement is constitutional. *Fraire*, 575 F.3d at 932.

> First, the court must determine whether the primary purpose of the [checkpoint] was to advance the general interest in crime control. If so then the stop is per se invalid under the Fourth Amendment. If the checkpoint is not per se invalid as a crime

control device, then the court must judge [the checkpoint's] reasonableness, hence its constitutionality, on the basis of the individual circumstances. This requires consideration of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.

*Id.* (internal quotations and citations omitted).

The first step is to determine the primary purpose of the checkpoint and whether that purpose was to advance general interest in crime control. The government argues that the primary purpose of the checkpoint at issue is to detect illegal aliens. Ruiz, however, argues that this a pretext and that general crime control and/or narcotics interdiction is the actual primary purpose.

Pursuant to the Supreme Court, "the United States has a substantial interest in controlling the flow of illegal aliens [and] [c]arrying out a program of routine stops for brief questioning at permanent checkpoints is effective in support of this interest." *United States v. Vasquez-Guerrero*, 554 F.2d 917, 919 (9th Cir. 1977) (citing *Martinez-Fuerte*, 428 U.S. at 556. In *United States v. Soto-Camacho*, 58 F. 3d 408 (9th Cir. 1995), the Ninth Circuit stated:

Except for the potential influence of drug intelligence on the decision of when within the month to activate it, the Jacumba Checkpoint does not differ in any material respect from the temporary checkpoint at Camp Pendleton that we condoned in Hernandez. Its primary purpose is to check for aliens, all vehicles are stopped, the checkpoint is well identified, Border Patrol agents exercise no discretion over the checkpoint's operation, and the stop itself involves a minimal intrusion.

58 F.3d at 411 (footnote omitted). In *Soto-Camacho*, the checkpoint was operational for about ten days out of each month, with "historical data reflecting trends of alien entries, alien smuggling, narcotics smuggling, and an evaluation of the peak periods of these trends" and "harvest seasons[,]" *id*. at 410, included as factors used to determine when the checkpoint would be operational. The historical data referred to included that "a large percentage of checkpoint narcotic seizures involve alien principals (during the period from January 21, 1992 through April 24, 1994, 76% of the narcotic seizures at the Jacumba Checkpoint involved alien principals)" and that:

Between January 21, 1992 and April 24, 1994, Border Patrol agents at the Jacumba Checkpoint made at least 322 separate illegal alien seizures and apprehended 1,544

illegal aliens. During the same period, there were 68 seizures of controlled substances discovered in vehicles and 87 persons were arrested as a result.

*Id.* at 410-11. After discussing *United States v. Watson*, 678 F.2d 765, 769 (9th Cir.), *cert. denied*, 459 U.S. 1038, 103 (1982), *Soto-Camacho* found the stop and search of Soto-Camaco had an "independent administrative justification," and "did not exceed in scope what was permissible under that administrative justification." *Soto-Camacho*, 53 F.3d at 412, (citing *Watson*, 678 F.2d at 771). Thus, the immigration checkpoint was "not infected" by the fact that Border Patrol based the timing of the operation of the checkpoint in part on drug intelligence. *Id.*

IV. *Purpose of the I-19 Checkpoint*

During the October 2016 hearing, Raleigh L. Leonard, Division Chief, Law Enforcement Programs, U.S. Border Patrol, Tucson Sector ("Leonard")[16] was asked what is the primary purpose of the checkpoints in the Tucson Sector; Leonard responded:

> A.    Immigration. The primary focus of everybody that crosses through or traverses through our checkpoint is to state their citizenship. It's immigration.
>
> * * * * *
>
> Q.    Now, you said the primary purpose is immigration and enforcing the immigration laws. Is that what you're talking about?
>
> A.    That's exactly what I'm talking before (sic). It's to detect persons who have crossed or traversed the border unlawfully so, thereby, they're an illegal alien or undocumented person, migrant, and they're trying to further their entry north into the United States.
>
> If they were to get onto the roadway, that would serve to expedite their entry into the United States as opposed to traversing through remote locations that are absent roads or that are very rugged. So the purposes of a checkpoint is it funnels traffic, cross-border, illicit traffic toward the checkpoints. It also provides a location where Border Patrol agents can stage and have a permanent presence of Border Patrol agents away from the border.

Transcript 10/25/2016 (Doc. 101) Leonard Testimony, pp. 19-20. Leonard also stated the use of canines is to detect concealed humans. *Id.* At 112.

---

[16]Leonard is now the Acting Deputy Chief, Tucson Sector.

1   Ruiz, however, argues that the use of the canine at the I-19 checkpoint made the

2   checkpoint unconstitutional in this case.  Indeed, checkpoint stops constitute a "seizure"

3   within the meaning of the Fourth Amendment.  *Edmond*, 531 U.S. at 34 (stop at drug

4   checkpoint constitutes a "seizure").  However, the Supreme Court has made a distinction

5   between checkpoints whose purpose is to control the flow of illegal aliens as compared to

6   a checkpoint established to interdict drug trafficking.  *Edmond*, 531 U.S. at 41.  Indeed, when

7   law enforcement pursues general crime control purposes at checkpoints, any stop must be

8   justified by some quantum of individualized suspicion.  *Id*. at 47.  Additionally,

9   "programmatic purposes may be relevant to the validity of Fourth Amendment intrusions

10  undertaken pursuant to a  general scheme without individualized suspicion[.]"  *Id*. at 45.

11  Further, the Ninth Circuit has stated that "where officers have broad discretion as to the

12  parameters of the search, the addition of an impermissible motive extends the scope of the

13  search, regardless of whether the items searched could have been subject to a valid

14  administrative search."  *United States v. Bulacan*, 156 F.3d 963, 970 (9th Cir. 1998), as

15  amended (Nov. 16, 1998); *see also Hernandez*, 739 F.2d at 488 (for *Martinez-Fuerte* to

16  apply, checkpoint need not operate all the time or be at a permanent structure; important

17  factor is lack of discretion when operated).  Except for a few known local residents, the

18  agents consistently follow the same procedure and are not granted discretion at the I-19

19  checkpoint.

20  Ruiz asserts that CBP  is unconstitutionally exceeding the scope of authority the

21  Supreme Court has permitted for use at immigration checkpoints by the use of canines

22  trained to identify both hidden persons and narcotics.  By using canines that are trained to

23  identify not only hidden persons, but also the odors of marijuana, heroin, cocaine,

24  methamphetamines, and their derivatives, Ruiz asserts CBP has transformed the limited stop

25  approved in *Martinez-Fuente* into a dual purpose checkpoint.  As one of those purposes is

26  investigating illegal drug trafficking, which is not permitted under *Edmund*, Ruiz asserts CBP

27  has violated his Fourth Amendment rights.

28  The government points to a number of cases that address the use of checkpoints and

- 21 -

canines to argue that the use of cross-trained canines at immigration checkpoints are constitutional. In *United States v. Barnett*, 935 F.2d 178, 181 (9th Cir. 1991) (citing *Horton v. California*, 496 U.S. 128 (1990), the Ninth Circuit stated that, although the Supreme Court's conclusion that checkpoints were constitutional in the limited immigration context, it "does not mandate an inquiry into the subjective purpose of the agent making referrals to secondary inspection, unless there is some objective evidence supporting the charges of pretext." *Id*. at 181. Similarly, in *United States v. Wilson*, 7 F.3d 828, 833 (9th Cir. 1993), the Ninth Circuit concluded that an officer's statement that he intended to conduct a canine sniff of the exterior of the car as soon as it was referred to secondary was not evidence of a pretext for a drug search because the "dog was trained to detect hidden persons as well as drugs." Further, the Ninth Circuit determined there was no constitutional violation where Border Patrol agents at an immigration checkpoint were cross-trained in narcotics detection. *United States v. Soyland*, 3 F.3d 1312, 1314 (9th Cir. 1993). Indeed, the Ninth Circuit has concluded that intelligence regarding narcotics trafficking that affected the timing of an immigration checkpoint did not make the stop improper. *Soto-Camacho*, 58 F.3d at 412.

The government also argues that *Edmond* did not implicitly overrule this line of Ninth Circuit cases. Rather, the Supreme Court was discussing a checkpoint whose primary purpose was to interdict illegal narcotics. In fact, the Court specifically stated that it was not deciding whether law enforcement could establish a checkpoint with a valid primary purpose and a "secondary purpose of interdicting narcotics." *Id*. at 47, n. 2.

Ruiz asserts, however, that the cases cited by the government do not address how the use of cross-trained canines transform an immigration checkpoint into the type of checkpoint the Supreme Court has found unconstitutional in *Edmund*. While this Court agrees with Ruiz that the Supreme Court did not address this issue, the Supreme Court specifically declined to address whether such a checkpoint is unconstitutional. Because the *Edmond* Court did not decide this issue, the reliance of Ruiz on *Edmond* is misplaced unless the primary purpose of the I-19 checkpoint is for general crime or narcotics interdiction.

Additionally, the Fifth Circuit has determined, post-*Edmund*, that a checkpoint with

a primary immigration purpose was constitutional "regardless of whether or not it could also be said to have a secondary programmatic purpose of drug interdiction." *United States v. Moreno-Vargas*, 315 F.3d 489, 491 (5th Cir. 2002). While this case does not provide precedential value, it does constitute persuasive authority. The government also points out that judges in the District of Arizona have recently concluded that a secondary purpose of drug interdiction or the use of a cross-trained canine at an immigration checkpoint does not make the immigration checkpoint unlawful or transform the checkpoint into a general crime control device. *See United States v. Wilson*, 650 Fed.Appx. 538 (9th Cir. May 27, 2016); *United States v. Romero-Cubillas*, No. CR-15-00374-TUC-RCC-LAB, 2015 WL 5674891, at *3 (D. Ariz. Aug. 10, 2015), Report and Recommendation adopted, No. CR-15-00374-TUC-RCC-LAB, 2015 WL 6579720 (D. Ariz. Sept. 25, 2015).

The Ninth Circuit has stated:

> Had [defendants] offered affirmative evidence that the first agent harbored a subjective purpose to refer to secondary inspection for drug-related offenses, we would be required to address the applicability of the cases that deal with pretextual seizures to the type of stop authorized by *Martinez-Fuerte*. [Citations omitted.] But in the absence of that evidence, we need not reflect upon the applicability of *Martinez-Fuerte* to referrals where it appears that the referral is only (or even partially) for drugs. [Defendants] have offered no evidence why this was not a legitimate immigration stop. The agent at initial inspection offered evidence consistent with an immigration purpose.[4] Thus, *Martinez-Fuerte* controls. No articulable suspicion was required.
>
> [4]*See United States v. Watson*, 678 F.2d 765, 771 (9th Cir. 1982), *cert. denied*, 459 U.S. 1038, 103 S.Ct. 451, 74 L.Ed.2d 605 (1982):
>
>> We assume that the administrative plan which led to the boarding of the [vessel] was motivated partly by suspicion of drug smuggling. However, the stop and search had an independent administrative justification, and did not exceed in scope what was permissible under that administrative justification. Therefore, we need not consider any criminal enforcement interest the Coast Guard may have had.

*Barnett*, 935 F.2d at 181-82. Indeed, the Supreme Court has stated that the walking of a drug-sniffing canine around a vehicle during a traffic stop is permissible, *Illinois v. Caballes*, 543 U.S. 405, 409 (2005).[17]

_____

[17]Moreover, the Supreme Court has stated that an "alert by a reliable canine can provide probable cause." *Florida v. Harris*, 133 S.Ct. 1050, 1058-59 (2013); *see also United*

Because the Supreme Court has left open this issue and the authority before the Court allows for a checkpoint with illegal alien control as its primary purpose and general crime interdiction as a secondary purpose, the Court finds the I-19 checkpoint is constitutional. Not only is the stated purpose of the I-19 checkpoint illegal immigration control, but the statistics provided by the government establish that 78.5% of the arrests for the one year period surrounding Ruiz's arrest were immigration related (72.5 % of the arrests were only immigration related arrests). Additionally, 57.9 % of the events were immigration related. Furthermore, the statistics do not take into consideration any deterrence caused by the checkpoint – i.e., immigration-related arrests in the areas around the checkpoint are likely increased because of the presence of the checkpoint. *See* November 18, 2016 Order (Doc. 84), Exs. 1-2. Moreover, there are "formidable law enforcement problems" posed by the northbound tide of illegal entrants into the United States, *Edmond*, 531 U.S. at 25 (quoting *Martinez-Fuente*, 428 U.S. at 551-54), which supports a conclusion the primary purpose of the I-19 checkpoint was to control the flow of illegal immigrants.

Further, Niky was trained to detect hidden humans – that he was also trained to detect narcotics does not diminish that his training for detection of hidden humans corroborates the government's assertion the primary purpose of the I-19 checkpoint was to control the flow of illegal aliens. The fact that Niky (and other canines) are trained to detect more than concealed humans and narcotics/drugs supports a conclusion the primary purpose of the I-19 checkpoint was not for narcotics/drug interdiction. As the evidence presented during the October 2016 hearing established, the canines are also trained to detect other items, including currency and firearms.

Additionally, as argued by the government, placing significant weight on the canines' ability/training to detect items other than concealed humans or the statistics in a primary purpose analysis would allow for potential manipulation of law enforcement efforts by drug

---

*States v. Lingenfelter*, 997 F.2d 632, 639 (9th Cir. 1993) (a "canine sniff alone can supply probable cause").

cartels.   If a significant percentage of arrests/seizures involving narcotics warranted a determination that a checkpoint was unconstitutional, drug cartels could arrange for significant narcotics trafficking through a specific checkpoint until it was deemed unconstitutional . . . and then more freely be able to subsequently transport narcotics through that area after the unconstitutional checkpoint was closed.  Further, if CBP was not permitted to train/reward canines for identifying or locating other items, drug cartels could potentially modify their procedures to take advantage of this failure (e.g., focus their efforts on using the most innocuous drivers/vehicles – those that would not cause suspicion without a canine alert).

Therefore, where agents have only limited discretion, neither the statistics nor an additional motive of using canines for not only human detection but also narcotic detections are significant factors in determining the primary purpose of a checkpoint.  Here, the agents have minimal discretion.  However, the Court has considered these factors, the evidence and the circumstances presented in this case and determines the primary purpose of the I-19 checkpoint is for immigration enforcement.  The use of the checkpoint on I-19, considering its proximity to the international border and high volume of traffic (including illegal alien traffic on I-19 and in the area) is reasonable.   The public concerns and the substantial interests of the United States in controlling the flow of illegal aliens which are significantly advanced by the use of the I-19 checkpoint supports a determination the I-19 checkpoint is constitutional.  Moreover, the interference with individual liberty is minimal.  Indeed, only a few questions are asked unless there is a basis for referral to the secondary inspection area. The Court finds the I-19 checkpoint is constitutional.

V.  *Extension of the Stop Based on the Use of a Drug-Sniffing Canine at the Immigration Checkpoint*

Ruiz argues that, if Niky had only been trained to detect hidden humans, he would not have been delayed by the referral to secondary.  Ruiz points out that the Supreme Court has determined that, where a motorist is detained for a canine sniff after the purposes of the

traffic stop has been completed, the traffic stop becomes an unlawful if it is "'prolonged beyond' the time in fact needed for the officer to complete his traffic-based inquiries is 'unlawful[.]'" *Rodriguez v. United States*, 135 S. Ct. 1609, 1611-12 (2015) (citing *Caballes*, 543 U.S. at 405. "The critical question is not whether the dog sniff occurs before or after the officer issues a ticket, but whether conducting the sniff adds time to the stop." *Id*.

The Supreme Court also stated that, while traffic stops generally involve inquiries such as checking the driver's license and inspecting a vehicle's registration, a canine sniff "is a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'" *Rodriguez*, 135 S. Ct. at 1615. Similarly, Ruiz argues, the use of drug-sniffing canines at immigration checkpoints expands the mission of immigration checkpoints. The stated "mission" of immigration checkpoints is to interdict the flow of illegal aliens and, thereby, minimize illegal immigration. *Martinez-Fuerte*, 428 U.S. 552. However, Ruiz argues, that by using a canine that is also trained to detect odors of narcotics, the mission of the immigration checkpoints has been expanded to include drug interdiction.

Additionally, Ruiz asserts that the use of drug-sniffing canines prolongs the time beyond which is required to ask "'a brief question or two and possibly [ask for] the production of a document evidencing a right to be in the United States.'" *Martinez-Fuerte*, 428 U.S. at 558 (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 880 (1975).

In essence, it seems Ruiz is asserting it is unconstitutional for law enforcement, while pursuing one law enforcement goal, to potentially address alternate or collateral law enforcement goals. However, the Supreme Court has not limited law enforcement in such a manner in other respects. Rather, the Supreme Court stated that it's holding in *Edmond* does not "alter the constitutional status" of the border checkpoints approved in *Martinez-Fuerte*. 531 U.S. at 47. Indeed, the holding in *Edmond* "does not impair the ability of police officers to act appropriately upon information that they properly learn during a checkpoint stop justified by a lawful primary purpose, even where such action may result in the arrest of a motorist for an offense unrelated to that purpose." *Id*. at 48. As summarized by the government, "the majority opinion in *Edmond* explicitly rejected the dissent's claim

1    that it was holding that the use of a "drug sniffing dog" annuls the constitutionality of a

2    checkpoint."  Response (Doc. 37), p. 6 (quoting *Edmund*, 531 U.S. at 44, n. 1).

3         Indeed, Ruiz has not pointed to any authority, in any context, where law enforcement

4    is precluded from taking action on a collateral law enforcement goal when they learn of it

5    during the original encounter.  For example, a traffic officer is not required to ignore a strong

6    odor of marijuana he notices as he is conducting the traffic violation stop.  The Supreme

7    Court has held that "the tolerable duration of police inquiries in the traffic-stop context is

8    determined by the seizure's 'mission' – to address the traffic violation that warranted the stop,

9    and attend to related safety concerns."  *Rodriguez*, 135 S.Ct. 1609 at 1614.  However, "[a]n

10   officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop.  But

11   . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion

12   ordinarily demanded to justify detaining an individual."  *Id*. "The odor of marijuana

13   emanating from a vehicle stopped during a lawful traffic stop is alone sufficient to constitute

14   probable cause for a subsequent search of that vehicle for marijuana."  *United States v.*

15   *Collier*, No. EDCR 13-19 JGB, 2015 WL 11123302, at *7 (C.D. Cal. Nov. 10, 2015) (citing

16   *United States v. Barron*, 472 F.2d 1215, 1217 (9th Cir. 1973).  According to the Supreme

17   Court, officers may "act appropriately upon information that they properly learn during a

18   checkpoint stop justified by a lawful primary purpose, even where such action may result in

19   the arrest of a motorist for an offense unrelated to that purpose." *Edmond*, 531 U.S. at 48.

20        In fact, Ruiz has not provided any authority that the use of a canine trained solely to

21   detect narcotics would be unconstitutional.  Where agents are in a location where they are

22   lawfully entitled to be (an immigration checkpoint) and performing acts they are

23   constitutionally permitted to do (inquiring of citizenship/immigration status), there is no basis

24   to conclude the use of a narcotics detection canine that does not delay the

25   citizenship/immigration inquiry is not permitted.  Should that canine alert to a vehicle,

26   probable cause then exists to investigate the collateral crime.  If there is no basis to conclude

27   the use of such a narcotics canine is unconstitutional, a finding that the use of canines trained

28   to detect multiple odors is not warranted.

1    In this case, Niky conducting a sniff did not add time to the stop.  Rather, it was the

2    results of the sniff that caused the referral to secondary inspection and the further detention

3    of Ruiz.  The use of the cross-trained canine in a place where agents were lawfully permitted

4    to be does not change the fact that the statistics and circumstances establish the primary

5    purpose of the I-19 checkpoint was to control the flow of illegal immigrants and that agents

6    are permitted to act on collateral information.[18]  Subsequently, the agents, with the assistance

7    of Niky, had probable cause to believe that either hidden persons or narcotics were in the

8    Tundra.  The subsequent search of the Tundra was not unconstitutional.

9

10   VI. *The Seizure in this Case and the Reliability of the Canine and the Handler*

11   Niky alerted to the truck Ruiz was driving in the pre-primary area.  It is not known if

12   Niky was alerting to an odor of a hidden human or narcotics.  Although reasonable suspicion

13   is not needed for a referral to secondary, *Barnett*, 935 F.2d at 181 ("The lack of evidence

14   supporting referral to secondary inspection is precisely what *Martinez-Fuerte* authorized.

15   It would set that decision on its head to say that, while agents do not need articulable

16   suspicion to refer for immigration-related inquiry, they must offer articulable suspicion of

17   immigration-related offenses to demonstrate that they are not referring for another

18   purpose."), Niky's alert gave the agents probable cause for the referral and to search for

19   illegal aliens or narcotics.  *Florida v. Harris*, 133 S.Ct. 1050, 1057 (2013) ("If a bona fide

20   organization has certified a dog after testing his reliability in a controlled setting, a court can

21   presume (subject to any conflicting evidence offered) that the dog's alert provides probable

22   cause to search."); *United States v. Cedano-Arellano*, 332 F.3d 568, 573 (9th Cir. 2003) (an

23   "'alert' by [a] certified, reliable narcotics detector dog [is] sufficient, even by itself, to

24   support a finding of probable cause").

25   Ruiz argues, however, that the "alert" referred to in case law has historically meant

26

27   [18]The *Edmond* Court stated that "[t]he fact that officers walk a narcotics-detection dog
     around the exterior of each car at the Indianapolis checkpoints does not transform the seizure

28   into a search."  531 U.S. at 40.

an "indication."  This is essentially based on Dr. Myers' experience, most specifically with *Florida v. Jardines*, — U.S. —, 133 S. Ct. 1409 (2013).  However, the Court is not aware of any precedent making such a distinction.  Rather, the Court agrees with the government that the terms as described by CBP have been used for years are apparently considered standard in cases discussing such events.  For example, in *Cedrano-Arellano*, the use of a CBP canine was at issue – the Ninth Circuit referred to the canine's alert.  The Court has no basis to conclude the Ninth Circuit, in stating that an alert by a certified reliable canine is sufficient to establish probable cause, was not using the term as used by CBP.  The Court finds this speculative argument does not affect the reliability of Niky's alert or warrants a finding the actions of the CBP agents were unconstitutional.

It does not appear that either the Supreme Court or the Ninth Circuit requires a detection canine to be certified to be reliable – rather, certification is just one consideration in determining if a canine and his handler are reliable.  However, Niky was certified which supports a finding Niky was reliable.  Niky's records show how frequently Niky has successfully alerted to hidden persons or substances.  Niky's certification score sheets and training records also show how consistently Niky performs well.  Agent Ewing and Niky have a reliable record as a canine team.  Moreover, Niky (and Agent Ewing) have been routinely evaluated for hidden persons or narcotics/drug detection indoors, outdoors and in vehicles, and consistently detected hidden persons and narcotics drugs.  *See* Ex. 1.

However, Ruiz argues the failure of the CBP Canine Program to certify using a double blind method (and train/maintain with a partial double blind method) does not ensure the reliability of the canines.  Indeed, Dr. Myers opines that a double blind method, along with a single blind method, in a certification for reliability procedure, should be used by an agency.  This minimizes cuing.  Additionally, the recommended use of a double blind method has been the opinion of behavioral scientists for almost 100 years and some organizations are moving towards this procedure.  During the October 2016 hearing, Dr. Myers acknowledged that his CV was incomplete and that his expertise after 2008 could not be adequately evaluated.  Although Dr. Myers partially updated his CV, the CV continues

to have significant gaps.  While the Court does not doubt Dr. Myers is highly educated, experienced, and respected in his field, the gaps in the CV and Dr. Myers' failure to have all relevant documents with him during his testimony, limited the government's ability to fully question Dr. Myers on his opinions.  The defense's insinuation that the incomplete material is because the government failed to request further updating fails to acknowledge it is not the government's responsibility to ensure the defense has adequately provided the bases and reasons for an expert's opinions or the expert's qualifications.

Moreover, while the Court finds Dr. Myers to be very knowledgeable regarding the scent ability of a canine, the Court also considers that Dr. Myers does not have practical experience in training canines.  Agent Markle has consistently worked with canines and the training of canine teams.  This provides a unique perspective to evaluate a training program while considering how the curriculum affects the reliability of the canines.  Further, the practical experience of Agent Markle and the canine handlers affords them opportunities to evaluate canine behaviors in the actual conditions which canine teams work (e.g., traffic around, changes in climate, etc.).  The Court finds Agent Markle's opinions as to the practicalities and the goal of evaluating canine teams being a basis for not utilizing a double blind method as frequently as recommended by Dr. Myers to be well-taken.  Moreover, this must be considered in conjunction with the fact that, in practice, during the initial training and certification process, a modified double blind method is used – the observer is behind a barrier which mitigates cuing to a canine.  While this procedure contrasts with the use of observers being close to a canine team during maintenance training, the alternate procedures allow observations of different scenarios and allow the canine teams to be evaluated in different ways.

Furthermore, the Court does not place significant weight as to the recommendation of SWGDOG.  It not clear whether this one organization recommends a single blind or a double blind method for canine training – Dr. Myers and Agent Markle each believe the organization recommends a different standard.  Neither party presented any documentary evidence as to the organization's current recommendation.    Moreover, any such

recommendation would be for the best practice.  No information was presented to the Court that a method not recommended by SWGDOG (or any other organization) necessarily did not produce reliable canine teams.  Rather, as acknowledged by Dr. Myers, the CBP Canine Program was extensive and comprehensive.  The thoroughness of the program and the success rate of certified canines and canine teams, as shown by Agent Ewing and Niky's success rate, confirms the CBP Canine Program trains reliable canine teams.

The Court finds the CBP Canine Program uses a training/certification method that the CBP reasonably believes produces the most reliable canine teams.  Agent Markle's testimony establishes CBP is consistently modifying the protocols to ensure the detector canines are thoroughly trained to be reliable.  Agent Markle believes CBP has adopted the best practices or has acknowledged them and recognize they are appropriate.  Further, this method does produce reliable canine teams.  Specifically, the Court finds Niky to be a reliable detection canine and finds Agent Ewing and Niky to be a reliable canine team.  Niky's certification is simply one factor in concluding he is reliable.  The Supreme Court has stated that "[t]he better measure of a dog's reliability . . . comes away from the field, in controlled testing environments." *Harris* 133 S.Ct. at 1057.  The training, maintenance, and testing protocols utilized by the CBP Canine Program bear this out.  In the controlled environments where efforts are made to minimize cuing, Niky performs reliably.  Based on the specific records of Niky and Agent Ewing, along with the evidence presented regarding the training protocols, the Court finds the government "has met its burden of proving [Niky's] reliability." *United States v. Neatherlin*, 66 F.Supp.2d 1157, 1160–61 (D.Mont. 1999) (stating evidence that the narcotics detection dog trains eight hours every two weeks, is tested and certified annually, and does not alert where no drugs are present "shows, by a preponderance of the evidence, that [the dog] is reliable").

Accordingly, IT IS ORDERED the Motion to Suppress (Doc. 34) is DENIED.

DATED this 15th day of March, 2017.

Cindy K. Jorgenson
United States District Judge